169 S.W.3d 685 (2005)
In the Interest of S.A.P., a Child.
No. 10-02-00345-CV.
Court of Appeals of Texas, Waco.
June 22, 2005.
*688 Charles L. Levy, Nita C. Fanning, Law Office of Nita Fanning, Waco, for appellant/relator.
Leona Jaquette, TX Dept. of Protective Services, Austin, for appellee/respondent.
Kevin Keathley, Waco, for ad litem.
Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

OPINION ON REMAND
BILL VANCE, Justice.

I. Introduction
This case, on remand from the Texas Supreme Court, is an appeal from the termination of the parent-child relationships of Rebecca Williams Peterson (Rebecca) and Jay Scott Peterson (Scott) with their child, S.A.P. Tex. Fam.Code Ann. § 161.001 (Vernon 2002). Rebecca's and Scott's parent-child relationships with S.A.P. were terminated in November 2002. They each brought several issues on appeal, complaining about (1) the legal and factual sufficiency of the evidence, (2) the testimony of Dr. James Shinder, and (3) the estoppel effect of letters from the Texas Department of Protective and Regulatory Services (TDPRS). In addition, Rebecca raised two issues regarding the effect of a prior termination, and Scott brought one charge issue.
We sustained Rebecca's third issue and Scott's fourth issue on the estoppel effect of the TDPRS letters and reversed the judgment and remanded the cause for further proceedings. In re S.A.P., 135 S.W.3d 165 (Tex.App.-Waco 2004), rev'd, *689 156 S.W.3d 574 (Tex.2005). The supreme court disagreed with our holding, reversed our judgment, and remanded the cause to us for consideration of the remaining issues. In re S.A.P., 156 S.W.3d 574 (Tex.2005).
Because we find that the evidence was factually insufficient to meet the clear and convincing burden of proof, we will now reverse the judgment and remand the cause for a new trial. Because of our disposition, we will also address several issues likely to arise if there is a retrial of this cause. See Edinburg Hosp. Auth. v. Trevino, 941 S.W.2d 76, 81 (Tex.1997); In re J.B., 93 S.W.3d 609, 617 (Tex.App.-Waco 2002, pet. denied).

II. Background
S.A.P. was born on June 8, 2001, to Scott and Rebecca.[1] Almost immediately after S.A.P. was born  and while he and Rebecca were still in the hospital  TDPRS took custody of him pursuant to a court order. Eleven months later, TDPRS amended its petition to seek termination of Scott's and Rebecca's parent-child relationships with S.A.P.
At trial, which began on November 18, 2002, the jury found neither Rebecca nor Scott had knowingly placed or allowed S.A.P. to remain in conditions endangering his well-being. See Tex. Fam.Code Ann. § 161.001(1)(D). But the jury found the following by clear and convincing evidence:
 Rebecca has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (Tex. Fam.Code Ann. § 161.001(1)(E));
 Rebecca has had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of sections 161.001(1)(D) or (E) of the Texas Family Code, or substantially equivalent provisions of the law of another state (Tex. Fam.Code Ann. § 161.001(1)(M));
 Termination of the parent-child relationship between Rebecca and S.A.P. is in S.A.P.'s best interest (Tex. Fam.Code Ann. § 161.001(2));
 Scott has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (Tex. Fam.Code Ann. § 161.001(1)(E));
 Scott has failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child (Tex. Fam.Code Ann. § 161.001(1)(O));
 Termination of the parent-child relationship between Scott and S.A.P. is in S.A.P.'s best interest (Tex. Fam.Code Ann. § 161.001(2)).

III. Issues
Rebecca and Scott brought separate appeals. Scott initially raised five issues, and the following four issues remain:
1. Did the court err in submitting a charge that included a definition of "endanger" that commented on the weight of the evidence admitted at trial?
2. Did the court err in allowing Dr. Shinder to testify on behalf of TDPRS?
*690 3. Did the court err in requiring Scott to be evaluated and counseled by Dr. Shinder and his associates?
5. Was the evidence legally and factually sufficient to support the jury's findings?
Rebecca brought six issues on appeal, five of which remain for consideration:
1. The evidence was legally and factually insufficient to support the jury's finding that Rebecca engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
2. The evidence was legally and factually insufficient to support the jury's finding that termination was in S.A.P.'s best interest;
4. The court erred by admitting Dr. Shinder's testimony without conducting a Daubert hearing, when such a hearing had been requested;
5. Section 161.211 of the Family Code violates parents' constitutional rights to due process; and
6. When a prior termination of parental rights serves as the basis for termination in a later case, the earlier termination should have been valid.[2]

IV. Charge Error
In his first issue, Scott complains that the trial court erred by submitting the following definition of "endanger" in the jury charge:
"Endanger" means to expose to loss or injury, to jeopardize. It is not necessary that the conduct be directed at the child or that the child actually suffer injury. Conduct before or after the birth of the child is relevant to endangerment.
Specifically, Scott asserts that the sentence "Conduct before or after the birth of the child is relevant to endangerment" is an impermissible comment on the weight of the evidence. Scott did not object in the trial court to this definition, and TDPRS asserts that he has thus waived this complaint on appeal.
Texas Rule of Civil Procedure 274 provides in part:
A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.
Tex.R. Civ. P. 274. By not objecting to the definition in the trial court, Scott has not preserved his complaint. Tex.R.App. P. 33.1(a); In re B.L.D., 113 S.W.3d 340, 354-55 (Tex.2003) (alleged jury charge error in termination case may not be raised for first time on appeal); Castleberry v. Branscum, 721 S.W.2d 270, 276-77 (Tex.1986) (complaining party must object to charge in trial court to preserve alleged error). We overrule Scott's first issue.

V. Dr. Shinder
In Scott's second issue and in Rebecca's fourth issue, they complain that the trial court erred in admitting the testimony and evidence of Dr. James Shinder without conducting a Daubert/Robinson hearing to determine the admissibility of his testimony and evidence. See e.g., J.B., 93 S.W.3d at 619-26.
*691 Rebecca filed a pretrial "Objection to Listed Experts and Motion for Voir Dire of Expert Witness" that made a general objection to all of TDPRS's named experts and requested a pretrial hearing on the admissibility of the testimony of the experts. Among those experts was James Shinder, Ph.D., a psychologist. In a pretrial motion-in-limine hearing held immediately before jury selection, Rebecca's attorney informed the trial court of this motion, and the trial court stated that the Daubert/Robinson motion would be heard when the issue came up at trial. When Dr. Shinder was called to testify at trial, no Daubert/Robinson hearing was requested by Rebecca or Scott, and no Daubert/Robinson hearing was held. And when Dr. Shinder testified and gave expert opinion testimony, neither Rebecca nor Scott objected to the admissibility of his expert testimony, and they did not object when Dr. Shinder's parenting assessment reports of Rebecca and Scott were offered and admitted into evidence.
To preserve a complaint that expert opinion evidence is inadmissible because it is unreliable, a party must object to the evidence before trial or when the evidence is offered.[3]Kerr-McGee Corp. v. Helton, 133 S.W.3d 245, 251-52 (Tex.2004); Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex.1998). Without requiring a timely objection to the reliability of the expert opinion evidence, the offering party is not given an opportunity to cure any defect that may exist and will be subject to trial and appeal by ambush. Maritime Overseas, 971 S.W.2d at 409. To hold otherwise is "simply unfair" because the offering party relied on the fact that the evidence was admitted without objection. Id.
Neither Rebecca nor Scott objected to Dr. Shinder's testimony or his reports. And despite the trial court's invitation to do so, when Dr. Shinder was called as a witness, Rebecca and Scott did not request the trial court to conduct a Daubert/Robinson gatekeeper hearing outside the jury's presence on Dr. Shinder's anticipated expert opinion testimony. Having failed to object or to request a hearing when Dr. Shinder was called as a witness, Rebecca and Scott have not preserved their complaints for appellate review. Id.; Tex.R.App. P. 33.1(a); see also In re B.L.D., 113 S.W.3d at 349-55 (discussing preservation of error in termination cases). We overrule Scott's second issue and Rebecca's fourth issue.
In his related third issue, Scott complains that the trial court erred in requiring him to be evaluated and counseled by Dr. Shinder and his associates.[4] Scott asserts that Dr. Shinder was prejudiced against him because of Dr. Shinder's prior involvement with Scott and Rebecca relating to Rebecca's other two children. Scott claims that as a result of being ordered to Dr. Shinder for evaluation and *692 counseling  instead of to an objective and independent psychologist  Dr. Shinder was able to obtain damaging information from Scott and then use it against Scott in his parenting assessment and at trial, where Dr. Shinder testified that Scott's parental rights over S.A.P. should be terminated. Scott concludes that the order to attend counseling and an evaluation with Dr. Shinder and Dr. Shinder's resulting opinions deprived him of due process under the U.S. and Texas Constitutions.
At the time he was ordered to go to counseling with Dr. Shinder or his staff, Scott expressed a desire to the trial court not to see Dr. Shinder or his staff because of a prior conflict relating to Rebecca's children. But at trial, Scott did not object to Dr. Shinder's testimony on any grounds, including those that he now raises for the first time on appeal. By not objecting at trial on these grounds, Scott has not preserved them for review on appeal. Tex.R. Evid. 103(a)(1); Tex.R.App. P. 33.1(a); see In re S.H., 2004 WL 254011 at *2 (Tex.App.-Waco 2004, no pet.) (mem.op.) (parent waived appellate complaint of trial court's temporary orders by not raising complaint in trial court). Due process and other alleged constitutional violations also must be raised in the trial court for them to be preserved for appellate review. In re L.M.I., 119 S.W.3d 707, 710-11 (Tex.2003); In re K.A.S., 131 S.W.3d 215, 230-31 (Tex.App.-Fort Worth 2004, pet. denied); see also B.L.D., 113 S.W.3d at 349-55 (discussing preservation of error in termination cases). We overrule Scott's third issue.

VI. Prior Termination
In this case, the jury found and the judgment reflected that Rebecca had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of subsections 161.001(1)(D) or (E) of the Texas Family Code. See Tex. Fam.Code Ann. § 161.001(1)(M). Specifically, in a January 31, 2001 Interlocutory [Default] Judgment of Termination, the same trial court (but in a different cause) terminated Rebecca's parent-child relationship with E.R.W. and T.M.W., her two children from a previous relationship. The interlocutory judgment states that the hearing took place on November 21, 2000, and that Rebecca had been served by personal service but had not timely answered or appeared. One of the grounds for termination was that Rebecca engaged in conduct or knowingly placed E.R.W. and T.M.W. with persons who engaged in conduct that endangers the physical or emotional well-being of the children, a predicate violation of subsection 161.001(1)(E).
The interlocutory judgment was made final in an October 11, 2001 Termination Decree that terminated the parent-child relationship of the father of E.R.W. and T.M.W. pursuant to the father's affidavit of relinquishment of parental rights.[5] The Termination Decree states that Rebecca did not appear on October 11, 2001, and that the interlocutory judgment of termination was now a final judgment for purposes of appeal, and it directed the clerk to send the required notice of final judgment to Rebecca's last known address.
Rebecca does not dispute these facts regarding the prior termination. She denied at trial that she was personally served with the amended petition that sought termination of her parent-child relationship with E.R.W. and T.M.W., but the citation *693 with the officer's return was in evidence. Rebecca testified that she had been attending all the hearings in the case before the amended petition was filed, but she did not get notice of the default judgment hearing. She also testified that Kim Gonzales, a TDPRS caseworker, mailed her a letter telling her that her parental rights to E.R.W. and T.M.W. had been terminated, but she was still allowed to visit her children. On the occasion of her visit with E.R.W. and T.M.W. in December 2000, Rebecca said that Gonzales told her that her rights had been terminated, and on her visit with them in January 2001, which had been arranged as Rebecca's "goodbye" visit with E.R.W. and T.M.W., Rebecca admitted that she filled out milestone books for each child for adoption purposes.
Gonzales testified that, immediately after a visit on November 22, 2001, had finished, she told Rebecca about the termination that had occurred only the day before, that she told Rebecca she ought to get legal advice, that she gave Rebecca legal referrals (to Legal Aid, which was across the street), and that Rebecca said she might go the next week. Rebecca denied being told this on November 22, 2001, and she said she was never told by anyone that she could ask the judge to appoint an attorney for her. Gonzales said that thereafter Rebecca called her twice about getting a copy of the termination judgment so that Rebecca could present it to the Attorney General's office to have the automatic child-support deduction from her paycheck stopped.
In this case, Rebecca filed a written pretrial objection to TDPRS's use of the prior termination. The objection set forth her allegations of lack of notice of the default judgment hearing, that her failure to answer was the result of mistake, accident, or fraud, and that a bill of review was being filed to have the default judgment set aside. At the pretrial hearing held on the day trial began in this case, the trial court heard Rebecca's objection and denied it. In the pretrial hearing, Rebecca's trial attorney informed the trial court that a bill of review to set aside the default judgment had been filed.
In her sixth issue, Rebecca asserts that the prior termination was not valid because (1) she allegedly had "appeared" in that proceeding by attending hearings before being served with the amended petition that sought termination and could not be defaulted, and (2) because she was not provided notice of the default judgment hearing. Rebecca asks us to find that the prior termination decree is void and thus cannot serve as the basis for the jury's finding that her parent-child relationship with another child had been terminated.
Rebecca's sixth issue is an admitted collateral attack against the prior termination judgment. It also seeks to have us decide the issues in her bill of review proceeding, which is not before us. "A collateral attack is an attempt to avoid the effect of a judgment in a proceeding brought for some other purpose." Ranger Ins. Co. v. Rogers, 530 S.W.2d 162, 167 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.). A collateral attack is proper only if the judgment is void. Cook v. Cameron, 733 S.W.2d 137, 140 (Tex.1987). A judgment is void only when it is apparent that the court rendering judgment had no jurisdiction of the parties, no jurisdiction of the subject matter, no jurisdiction to enter the judgment, or no capacity to act as a court. Mapco, Inc. v. Forrest, 795 S.W.2d 700, 703 (Tex.1990) (orig.proceeding); Cook, 733 S.W.2d at 140. Errors other than lack of jurisdiction render the judgment merely voidable, rather than void. Mapco, 795 S.W.2d at 703. In a collateral attack, extrinsic evidence may not be used to establish *694 a lack of jurisdiction. Huffstutlar v. Koons, 789 S.W.2d 707, 710 (Tex.App.-Dallas 1990, orig. proceeding) (citing Crawford v. McDonald, 88 Tex. 626, 631, 33 S.W. 325, 329 (1895)).
Rebecca was served with citation and the amended petition that sought termination. While she had been appearing at hearings before TDPRS amended its petition, she failed to file an answer, and a default judgment was entered. The default judgment is not void, which Rebecca candidly admits in a post-submission letter brief. See Villalon v. Bank One, ___ S.W.3d ___, ___, 2004 WL 1404023 at *2 (Tex.App.-Houston [1st Dist.] 2004, pet. denied) (where party who had answered did not receive notice of trial setting and judgment entered against that party, judgment was not void). Rebecca's collateral attack in this appeal on the prior termination judgment  which is also the subject matter of her direct attack in her bill of review  is impermissible. We overrule her sixth issue.
In her fifth issue, Rebecca asserts that section 161.211 of the Texas Family Code-which provides only a six-month window for a direct or collateral attack on the validity of a termination order  is unconstitutional.[6] This complaint is or would be an issue in her bill of review proceeding in which she directly attacks the prior default judgment of termination, so it likewise is not before us. Also, this complaint was not raised in the trial court, so it has not been preserved for appellate review. Tex.R.App. P. 33.1(a); L.M.I., 119 S.W.3d at 710-11. We overrule her fifth issue.

VII. Legal and Factual Sufficiency of the Evidence
Scott's fifth issue challenges the legal and factual sufficiency of the evidence to support the jury's findings that (1) he has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, (2) he has failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, and (3) termination of the parent-child relationship between Scott and S.A.P. is in S.A.P.'s best interest.
In her first and second issues, Rebecca challenges the legal and factual sufficiency of the evidence to support the jury's findings that (1) Rebecca engaged in conduct *695 or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child and (2) termination was in S.A.P.'s best interest, respectively.

A. Standards of Review
The natural right that exists between parents and their children is one of constitutional dimension. In re J.W.T., 872 S.W.2d 189, 194-95 (Tex.1994). A parent's right to "the companionship, care, custody and management" of his or her children is a constitutional interest "far more precious than any property right." Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)). Therefore, in a case terminating parental rights, the proceedings should be strictly scrutinized and the involuntary termination statutes strictly construed in favor of the parent. Holick v. Smith, 685 S.W.2d 18, 20 (Tex.1985); cf. Ray v. Burns, 832 S.W.2d 431, 434 (Tex.App.-Waco 1992, no writ) (in reviewing sufficiency of the evidence, "close calls" go to the parent) (citing Lewelling v. Lewelling, 796 S.W.2d 164, 168 (Tex.1990)). Termination is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence." Spangler v. Texas Dept. of Prot. & Reg. Servs., 962 S.W.2d 253, 256 (Tex.App.-Waco 1998, no pet.). This standard is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id.
In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, TDPRS must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (1) of section 161.001 (termed a predicate violation); and (2) that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001; Swate v. Swate, 72 S.W.3d 763, 766 (Tex.App.-Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. Holley v. Adams, 544 S.W.2d 367, 370 (Tex.1976); Swate, 72 S.W.3d at 766. If multiple predicate violations under section 161.001(1) were found in the trial court, we can affirm based on any one ground because only one predicate violation under section 161.001(1) is necessary to a termination judgment. In re S.F., 32 S.W.3d 318, 320 (Tex.App.-San Antonio 2000, no pet.).
In light of the clear and convincing evidence burden of proof in termination proceedings, the Texas Supreme Court has recently clarified the appellate standards of review to be applied to legal and factual sufficiency of the evidence challenges. In re J.F.C., 96 S.W.3d 256, 264-68 (Tex.2002) (discussing legal sufficiency review); In re C.H., 89 S.W.3d 17, 25 (Tex.2002) (discussing factual sufficiency review). Because termination findings must be based upon clear and convincing evidence, not simply a preponderance of the evidence, traditional legal and factual standards of review are inadequate. J.F.C., 96 S.W.3d at 264-65; C.H., 89 S.W.3d at 25. Instead, both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof. J.F.C., 96 S.W.3d at 265-66; C.H., 89 S.W.3d at 25.
In a legal sufficiency review, a court should look at all the evidence in the *696 light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.
If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.
J.F.C., 96 S.W.3d at 266.
In a factual sufficiency review, a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. Id.
[T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.
Id. at 266-67 (footnotes and citations omitted). We view the evidence in a neutral light when reviewing for factual sufficiency.

B. The Evidence
On June 8, 2001, Rebecca gave birth to S.A.P. at a hospital. That night or the next day, TDPRS workers came to her room as she was nursing her newborn son, told her to stop breastfeeding him, and said that she would not be able to take him home. Rebecca said that they did not explain why, except to allude to the Department's involvement with her two older children, to whom her parental rights previously had been terminated. Scott was not present at the time but found out later that the Department would be taking his baby. He also testified that they did not tell him why. TDPRS caseworker Kim Gonzales testified that they had received a hotline phone call and that it was Department policy to tell the parents why their child is being removed. The emergency removal notice listed "Risk of Abandonment" as the reason for removal. Kynetta Noble, a TDPRS caseworker, testified that S.A.P. was removed because of the risk of abuse or neglect because of Rebecca's and Scott's prior history.[7]
*697 TDPRS took physical custody of S.A.P. at the hospital on June 11, 2001. About two weeks later, Rebecca and Scott each received letters from TDPRS, dated June 21, 2001, stating that the Department had ruled out any allegations of abuse or neglect by Rebecca or Scott against S.A.P. The letters, which differed only in that one was addressed to Rebecca and one to Scott, stated:
Child Protective Services has completed an investigation based on a report dated 6/8/2001 that you were responsible for abuse or neglect of one or more children in the above named case [Williams, Rebecca L.]. Agency staff has concluded that you did not have a role in the alleged abuse or neglect. We will be offering services to your family to remedy any other problems identified during the investigation. Because all allegations involving you as an alleged perpetrator have been ruled out, you have the right to request that we remove information about your alleged role from our records....
The letter went on to explain that each parent should fill out an attached form to make such a request. The form, "Request for Removal of Role Information From Child Protective Service Case," stated, immediately above the signature block, that making such a request would effect the complete removal and permanent destruction of information from the Department's records. Both Scott and Rebecca signed and returned the forms on July 6, 2001, and August 6, 2001, respectively. Noble testified that S.A.P. had not been abused or neglected by Scott or Rebecca.
After S.A.P. was removed from his parents, TDPRS offered them services with the stated goal of family reunification. These "offered" services became court-ordered. Scott and Rebecca participated in these services, and they also voluntarily took parenting classes and participated in religious premarital counseling with their minister. Noble said that they were compliant in participating in a majority of the services, but they did not progress in demonstrating the ability to appropriately provide for S.A.P.
Noble testified that reunification with S.A.P. was the goal of TDPRS for the Petersons as of April or May 2002. One of her primary concerns was that Scott would not acknowledge that some of his past behavior had led to prior involvement of New York child protective services (CPS) and TDPRS since 1992 with his and Rebecca's children from prior relationships, while Rebecca had been able to understand their prior involvement. Noble said that Rebecca had better potential to get S.A.P. back if she separated from Scott. With a dismissal date of December 2002 looming, and having worked with the Petersons on S.A.P.'s case for 18 months, Noble said that TDPRS had offered all the services that it could and the Petersons had made as much progress as could be made, but she had no more time to work with them before the case would have to be dismissed. Therefore, termination, rather than reunification, became the recommendation of TDPRS so that S.A.P. could be placed for adoption.
Scott (age 36 at the time of trial) had been called to active status in the Army from the National Guard Reserve at the time of trial and was living at Fort Hood. He was first in the Army at Fort Drum in New York from 1987 to 1991, when he said *698 he was "chaptered" out because they decided that he "wasn't able to handle military status" because of problems with his first wife and their two children. Scott testified that while he was away in the military, New York CPS came to his house many times to investigate reports of abuse and neglect of his children with his first wife. He explained that when he went out to the field, he would always get called back because of his wife's problems with their children. He described these problems as not having food in the house, not "handling" the children, and the children "running out in the street when I was gone."
Scott had two children, J.S.P., a son, and C.P., a putative daughter, with his first wife. According to Scott, paternity testing ruled him out as C.P's biological father. At age four, C.P. made an outcry of sexual abuse (a finger placed in her vagina), and Scott was ordered by a New York court not to see or talk to either of his children. Scott strongly denied perpetrating the alleged sexual abuse of C.P. and was never arrested or prosecuted for it. He did not deny that sexual abuse of C.P. had occurred, only that he was the not perpetrator. Scott said that a medical investigation of the sexual abuse pointed to his ex-wife as the perpetrator, and Rebecca testified that Scott's ex-wife admitted committing the sexual abuse. In the case involving Rebecca's other children and with S.A.P., TDPRS had concerns early on about the sexual abuse allegation against Scott. But TDPRS never knew the particular details of the allege abuse, nor did it ever obtain the New York CPS records regarding the alleged sexual abuse. Dr. Shinder did a sex-offender evaluation on Scott, but it was inconclusive. Dr. Shinder suggested that Scott take a polygraph, but although Scott volunteered to take a polygraph, it was never done.
Before Scott's parental rights to J.S.P. and C.P. were terminated in New York, his children were under the care of New York CPS for four years, and New York CPS had been involved with them for most of their lives. Other allegations, which Scott denied, were that his children had been tied up and that he had attempted to strangle his first wife. In 1992, Scott lost custody of his children, and around 1995 or 1996, a New York court terminated his parent-child relationship with them. He claimed that he learned that his rights had been terminated after the fact. Scott said that he went to court hearings on his children, but Rebecca said that Scott didn't attempt to prevent this termination. Dr. Shinder testified that Scott told him that his mother testified against him in the New York CPS proceedings, but Dr. Shinder did not know what stage of the proceedings that she testified in or what the substance of her testimony was. Scott last saw his children in 1992.
While he was in the Army in New York, Scott was involuntarily committed to a military psychiatric facility for fifteen days after threatening to "put a bullet in someone" at a moment of frustration over the legal proceedings involving his children. Scott testified that he did not mean that he was actually going to shoot someone, but that he was just expressing his frustration. Dr. Shinder said that a stay for that length of time indicated a serious concern. Other than that occasion and the evaluations relating to S.A.P.'s case, Scott had no other mental health history.
Rebecca, age 29 at the time of trial, had two children, E.R.W. and T.M.W., from a prior relationship in New York with Frederick Crowell. E.R.W. was born on March 26, 1992 in New York. After E.R.W.'s birth, they lived with friends because the hospital incorrectly believed that Crowell did not have running water at his house. *699 Rebecca's parents went to New York and brought Rebecca and E.R.W. back to Texas. Rebecca then returned to New York and reunited with Crowell, and they had T.M.W. on July 30, 1993. Rebecca and Crowell never married, and they separated after an argument. Rebecca and her children returned to Texas around September 1993. Crowell returned separately to Texas but had no contact with them. Crowell was never a part of the lives of E.R.W. and T. M.W., and he did not support them financially or in any other way. Rebecca's aunt told her that Crowell was later arrested and imprisoned for sexually assaulting a thirteen-year-old girl.
Rebecca and her two children returned to New York in 1996, and they lived with Crowell's brother. It was at Fort Drum where Scott met Rebecca, a native of Hillsboro, Texas (Rebecca's father had been stationed at Fort Drum). In May 1996, Rebecca moved in with Scott and his wife after she and Scott had become acquainted and Scott offered to help her out. At that time, Scott and Rebecca were not involved in a relationship. Rebecca had begun using marijuana, and at the encouragement of Scott, she entered an outpatient drug rehabilitation treatment for marijuana abuse. Rebecca completed her drug rehab program, never had any drugs or alcohol thereafter, and as of the time of trial had been clean for six years.
While she was in rehab, Rebecca gave custody of E.R.W. and T.M.W. to their paternal grandmother, Rosy Crowell. Rebecca visited her children weekly for about a month. Rosy went to court behind Rebecca's back and obtained temporary custody of E.R.W. and T.M.W. and a stipend from the state that came with such custody. After the first few court hearings, Rosy began to ignore and avoid court hearings and was able to avoid Rebecca and New York's social services by moving and hiding the children so that she could keep receiving the stipend.
Rosy, an alcoholic, had custody of E.R.W. and T.M.W. for a year and a half, during which they were abused and neglected. While she knew that Rosy had not raised her own children, Rebecca testified that she had no idea that Rosy would abuse and neglect her children. Rosy hogtied E.R.W., threw tables at him, and kept him in a closet in which he ate, slept, and urinated. T.M.W.'s head was shaved because of constant head lice because the grandmother wouldn't wash her hair. After about nine months, Rosy was located and Rebecca obtained temporary custody of her two children in December 1997. Rosy was ordered not to be around the children. Because of the sexual abuse allegation relating to Scott's daughter, Rebecca said that her lawyer or social services caseworker in New York had counseled her to keep her children away from Scott.
After she obtained temporary custody, Rebecca's father sent her bus money, and she and her children left Texas before a final hearing in New York. Rebecca later returned to New York and was granted permanent custody of her children. In the interim, New York social services had contacted TDPRS regarding the services that the children could receive in Texas, and TDPRS sent a February 19, 1998 letter that stated:
At the request of Jefferson County Department of Social Services in New York, the Texas Department of Protective and Regulatory Services can provide a psychological evaluation for Rebecca Williams and her children if needed, as well as parenting classes and counseling for the mother and counseling for the children if recommended by the psychological evaluations. A TDPRS caseworker would make monthly *700 visits to ensure the safety of the children.
Upon her return to Texas, Rebecca and her children moved in with her aunt and uncle near Itasca for a few months. They then lived with her mother (an alcoholic) and then her father (whom she said had sexually abused her) until April 1998, when Scott, who had separated from his wife, moved to Texas and lived with them at Rebecca's mother's house. Shortly thereafter, Scott, Rebecca, and the two children moved to a house in Itasca. A TDPRS caseworker from Hillsboro came to the home, checked out the conditions, and approved the situation. Rebecca said that Scott never mistreated her children, that they acted together as a family (e.g., walking together to and from school and going on outings), that he helped with discipline, and that she never had a concern about leaving them with Scott. Scott said that he considered himself their stepfather and that he wanted to adopt them. They moved several more times (to Aquilla and to West) before finding a home to purchase in Elm Mott. At the time of trial they had lived in Elm Mott for almost three years.
TDPRS became involved with Rebecca in 1995 as a result of a report of physical abuse (pulling hair) of her daughter, T.M.W., and Rebecca attended an anger-management class and that file was closed. In 1999, Scott was reported to TDPRS for slapping T.M.W., but the allegation was ruled out because Rebecca had actually slapped T.M.W. for saying a dirty word. Before Scott moved to Texas, E.R.W. had begun having behavior problems, and teachers were reporting that he could not control himself and were requesting that Rebecca have him tested for ADHD and treated if warranted. Rebecca complied and also sought counseling from MHMR, but it only provided Ritalin, which she said was ineffective. E.R.W.'s behavior worsened, and problems (fighting) arose with T.M.W., who had been "treated like a queen" by both grandmothers and given everything she wanted, and E.R.W., who had been abused and ignored by Rosy. Unable to obtain help, Rebecca and Scott took both children to the Itasca Children's Home for two weeks. Thereafter, when the problems remained and E.R.W.'s violent behavior toward other children at school worsened, Rebecca and Scott contacted TDPRS since it had offered to provide counseling services in the letter to New York social services. TDPRS referred her to DePaul Center, a residential treatment facility, and then to Dr. Shinder, but she could not get appointments or treatment for E.R.W.
After E.R.W. had yet another violent episode with another child, Rebecca called TDPRS again and was told to call the hotline to get help. Noble said that Rebecca told her that she could no longer handle the children because they were out of control. Scott and Rebecca brought E.R.W. and T.M.W., along with clothes, sleeping bags, and pillows, to TDPRS on April 25, 2000 around 4:30 p.m., where they met with Noble, who took the children. Rebecca said that she went home and cried. E.R.W. initially went to a residential treatment center, and T.M.W. was placed in a basic care foster home. E.R.W. was subsequently placed in a basic care foster home when it was determined that he did not require a higher level of care.
Rebecca said that when she brought the children to TDPRS, she was told that she could pick them up the next day, but when she called the next day, she was told she would have to go through the court to get them back. Her expectation was that the children would get evaluated and she would pick them up the next day and be *701 told how TDPRS was going to help them. Gonzales denied that Rebecca sought their return the next day. TDPRS noted a "refusal to accept parental responsibility," rather than abandonment, as the parental conduct at issue on this occasion. Rebecca testified that she took her children to TDPRS to get them help and counseling, not to give them up. Gonzales said that she told Rebecca that leaving her children with TDPRS could lead to termination, which could affect her parent-child relationship should she have another child.
Soon thereafter, Rebecca began attending court hearings, and a service plan was prepared for her and the children. Rebecca and Scott were ordered to attend counseling and therapy, and Scott was ordered to have no contact with E.R.W. and T.M.W. as a result of the New York sexual abuse allegation. Rebecca participated in the service plan to reunite with her children. She scheduled and made about six visits with them. Gonzales said that Rebecca loved her children but did not know how to show it.
Gonzales testified that Scott was adamant that he should not have to attend those services because "the children's behavior is what brought them into foster care, not his own." She said that Scott's view was that he was not going to attend services, that TDPRS needed to fix Rebecca's children, and that it was the fault of TDPRS that the children had problems. Scott testified that TDPRS had the responsibility to "fix" Rebecca's children and that he wanted them to get help. Noble said that both Scott and Rebecca stated that the State should provide services for Rebecca's children based on the letter that TDPRS previously had sent to New York social services.
Gonzales testified that E.R.W. and T.M.W told her they were in foster care because "we're bad," and when Gonzales asked Scott to talk to the children about it not being their fault, Scott's response was that he was not going to lie to them, but Rebecca did talk to the children about it not being their fault. Gonzales testified that Scott was not receptive to change, that he was difficult to work with, and that he was verbally volatile and threatening. He told her that the court and the system were corrupt, that he would overturn it all, and that he did not need to cooperate with TDPRS. Scott explained that by corrupt, he meant that things were not being done "by the book."
Gonzales said that Rebecca and Scott never asked to get E.R.W. and T.M.W. back and did little, if anything, to actually get them back. Rebecca never said that she did or did not want them back, but she did say that she did not want them adopted. Rebecca said that TDPRS knew that she wanted her children back; that's why she was participating in their services. Based on Scott's refusal to participate in TDPRS services and Rebecca's failure to attend therapy, in September 2000 TDPRS changed its plan for E.R.W. and T.M.W. to termination and adoption.
The evidence relating to the termination of Rebecca's parent-child relationship with E.R.W and T.M.W. is set out in our discussion above on Rebecca's fifth and sixth issues. Both E.R.W. and T.M.W. were subsequently adopted.
After S.A.P. was taken into TDPRS custody from the hospital, Scott visited S.A.P. about twenty times, but after being called to the Army in September 2002, he had only been able to visit him three times as of the time of trial because he could not go back and forth from Fort Hood, where he was working a 9-to-5 job. Rebecca said that at Scott's visits with S.A.P., Scott would feed and burp him, but he would not change his diaper. Scott missed several of the TDPRS permanency plan team *702 ("PPT") meetings because he had to work; TDPRS required him to keep a stable job, but if he missed work, he would be fired. Scott admitted that he was behind on paying monthly child support for S.A.P. of $155, but he paid it during the times he was employed and that he was now catching up with an agreement to pay $200 every two weeks. He said it was partially his fault that he was behind but that he was catching up.
Scott was ordered by the trial court to receive counseling from Dr. AliceAnne Brunn, a Waco psychologist, and on his first visit for evaluation and testing, he became disruptive, yelled in the waiting room, and was asked to leave. Scott explained that he was upset because he had been given the incorrect tests and thought that TDPRS had misled him. He returned later that day, apologized, and did the testing. Because of these problems with Scott, Dr. Brunn would not see Scott as a patient for psychotherapy. Dr. Brunn testified that Scott had a lot of trouble with Rebecca's son E.R.W. and that he was unwilling to attend family therapy to help with E.R.W.'s behavioral problems; instead, she described his attitude as being that "somebody else should fix this child," which Dr. Brunn saw as a concern for S.A.P. should Scott have to deal with problems with him in the future.

C. The Findings as to Scott
The jury and the trial court's judgment found two predicate violations under section 161.001(1) for Scott: (1) that he engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (TEX. FAM.CODE ANN. § 161.001(1)(E)); and (2) that he failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child (TEX. FAM.CODE ANN. § 161.001(1)(O)).
In his fifth issue (5-A), Scott challenges the legal and factual sufficiency of the evidence to support the finding under subsection 161.001(1)(E).
To endanger means to expose to loss or injury, to jeopardize. Texas Dep't Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987); see also In re M.C., 917 S.W.2d 268, 269 (Tex.1996). Under subsection 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. K.A.S., 131 S.W.3d at 222; Dupree v. Tex. Dep't Prot. & Reg. Servs., 907 S.W.2d 81, 83-84 (Tex.App.-Dallas 1995, no writ). Termination under subsection 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. Boyd, 727 S.W.2d at 533-34.
While "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. Id. at 533. An actual or concrete threat of injury to the child need not be proved. Director of Dallas County Child Prot. Servs. Unit of Tex. Dep't Human Servs. v. Bowling, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ). The specific danger to a child's physical or emotional well-being need not be established as an independent proposition, but it may be inferred from *703 parental misconduct. See Boyd, 727 S.W.2d at 533. The conduct need not be aggressive behavior or physically abusive conduct; it can include emotional, as well as physical, endangerment. In re S.H.A., 728 S.W.2d 73, 84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). A parent's conduct toward one child will suffice to support termination of another child, and that conduct need not have occurred in the child's presence. Lucas v. Tex. Dep't Protective & Regulatory Servs., 949 S.W.2d 500, 503 (Tex.App.-Waco 1997, writ denied).
"Endangerment may include what a parent does both before and after birth of a child." In re U.P., 105 S.W.3d 222, 234 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). But, "acts done in the distant past, without showing a present or future danger to a child, cannot be sufficient to terminate parental rights." Wetzel v. Wetzel, 715 S.W.2d 387, 391 (Tex.App.-Dallas 1986, no writ) (evidence didnt support termination of mother's rights based on finding mother engaged in conduct which endangered physical or emotional well-being of children because evidence showed mother had been cured of mental problems that caused her to abuse children); see also Hendricks v. Curry, 401 S.W.2d 796, 800 (Tex.1966) ("These provisions do not contemplate that an adjudication may be based solely upon conditions which existed in the distant past but no longer exist."); In re R.R.F., 846 S.W.2d 65, 68-69 (Tex.App.-Corpus Christi 1992, writ denied) (father's conduct five years before trial was too remote to support termination where there was no evidence this prior conduct was a future threat to children); cf. J.B., 93 S.W.3d at 617-19 (discussing lack of relevance of home's condition several years before child's birth). For example, a judgment terminating a mother's rights was reversed and remanded for a new trial where the only allegations of abuse  scalding of the child in water where there was a dispute over how hot the water was and hitting the child in the face  occurred three years before the termination order and there was no evidence of repetitious or similar conduct. See Johnson v. Jefferson County Child Welfare Unit, 557 S.W.2d 569, 571-72 (Tex.Civ.App.-Beaumont 1977, no writ).
In re Cochran involved possession of a newborn at a 14-day hearing under section 262.201 of the Family Code, but it is instructive. In re Cochran, 151 S.W.3d 275 (Tex.App.-Texarkana 2004, orig. proceeding). In this case the mother's parental rights to her other nine children and the father's parental rights to his other three children had previously been terminated. Five days after the child was born at home with a midwife attending, TDPRS received a hotline tip, investigated, took possession of the newborn because of the parents' history, and filed suit to terminate their rights. In addressing the trial court's finding that there was a danger to the physical health or safety of the child caused by the parents' conduct, the court of appeals noted that the most recent prior termination was fourteen months earlier:
Thus, the conditions, acts, or omissions forming the bases of those terminations occurred at least fourteen months before H.H.H. was born and, obviously, could not have posed a danger to her. In the absence of any current conditions or actions that would constitute a danger to H.H.H.'s health or safety, the trial court could not have reasonably based its findings on the prior terminations alone. We conclude that the trial court could not have found that the parents' prior terminations were acts or omissions under Section 262.201(b)(1) of the Texas Family Code which posed a danger to H.H.H. when the conduct resulting in *704 the prior terminations was committed before her conception.
...
Relators have shown that, on this evidence, the trial court could have come to only one reasonable conclusion, that the Department failed to show that an act or failure to act by Cochran or Hotz posed a danger to the physical health or safety under Section 262.201(b)(1) and that present possession of H.H.H. should have been returned to her parents as required under Section 262.201(a).
Id. at 280-81 (footnote omitted).
Scott's principal complaint in challenging the sufficiency of the evidence is that his conduct toward other children (his first two children and Rebecca's children) that occurred before S.A.P.'s birth should not be used as a basis for termination under subsection 161.001(1)(E), and that therefore there is no or insufficient evidence that he endangered S.A.P., given that S.A.P. was taken by TDPRS almost immediately after he was born. TDPRS candidly admitted that its case against Scott under subsection 161.001(1)(E) was based on Scott's prior conduct relating to his two children and to Rebecca's two children.
As outlined above, Texas case law holds that pre-birth conduct toward other children is relevant under subsection 161.001(1)(E). We thus reject Scott's request to contravene this body of law, to ignore all pre-birth conduct toward other children, and to sustain his no-evidence issue on this basis. Further, considering all the evidence in the light most favorable to the jury's finding, we find that a reasonable trier of fact could have formed a firm belief or conviction that this finding was true. J.F.C., 96 S.W.3d at 266.
On Scott's factual-sufficiency complaint, we have carefully reviewed the entire record in a neutral light. On the jury's finding against Scott on the subsection 161.001(1)(E) predicate violation (that he engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child), we have considered whether the disputed evidence is such that a reasonable trier of fact could not have resolved that disputed evidence in favor of the jury's finding. We conclude that, in light of the entire record, the disputed evidence that a reasonable trier of fact could not have credited in favor of the finding is so significant that a trier of fact could not reasonably have formed a firm belief or conviction that Scott engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children.
Our conclusion is based in part on the remoteness of Scott's conduct relating to his first two children and the scant evidence that his past conduct shows a present or future danger to S.A.P. Scott last saw his first two children in 1992, ten years before the trial on S.A.P. His parental rights to these children were terminated in New York in 1995 or 1996. TDPRS did not obtain and put into evidence any records from the New York termination proceeding. More importantly, the principal evidence against Scott relating to the New York termination was the sensational and unproven allegation of sexual abuse of Scott's putative daughter, and Scott vigorously denied being the perpetrator. Other than testimony about the mere allegation, there was no evidence of sexual abuse by Scott of his putative daughter, and the jury's determination that Scott had engaged in conduct that endangered the physical or emotional well-being of the child could have been made only on speculation and conjecture that Scott committed this sexual abuse and by giving undue weight to the mere sexual-abuse allegation. *705 Additionally, the evidence relating to other abuse or neglect (e.g., lack of food and running in the street) of his children involved his ex-wife's care of them while he was away with the military. In sum, the evidence pertaining to Scott's conduct toward his two children in New York was disputed and weak; there was scant evidence that his children's physical or emotional well-being were endangered. Overall, the evidence pertaining to Scott's first two children was of low probative value.
As for Scott's conduct toward Rebecca's first two children, the principal evidence relied on by TDPRS was Scott's failure to take responsibility for helping them, his attitude that TDPRS was responsible for "fixing" them, and his failure to participate in TDPRS services relating to them. Both Scott and Rebecca testified that they thought that TDPRS would provide services for E.R.W. and T.M.W., based on the 1998 TDPRS letter to New York social services. And while his assertion that he had no responsibility to them because they were not his children is unbecoming, Scott and Rebecca testified about Scott's care and concern for E.R.W. and T.M.W. and his close involvement with them at home, at school, and on family outings. Dr. Brunn expressed a concern that Scott's past attitude and behavior toward treating E.R.W.'s behavior problems could repeat with S.A.P., but her example of Scott's concern about S.A.P.'s thumb-sucking is not a compelling showing of present or future conduct endangering S.A.P.[8] A reasonable trier of fact could not reasonably have formed a firm belief or conviction that Scott engaged in conduct that endangered the physical or emotional well-being of Rebecca's other two children.
Finally, in closing argument, TDPRS further revealed the evidentiary weakness in the case, stating that termination of Scott's and Rebecca's rights was not an easy thing to ask a jury to do "because there is no abuse here, no really bad people," "just some people who can't function as parents."
We hold that the evidence is factually insufficient on the jury's finding against Scott on the subsection 161.001(1)(E) predicate violation. We therefore sustain this portion (5-A) of his fifth issue.
We next address Scott's challenge in his fifth issue (5-B) on the sufficiency of the evidence on the subsection 161.001(1)(O) predicate violation.
No court orders relating to S.A.P. and that specifically established the actions necessary for Scott to obtain the return of S.A.P. were in evidence. Only one service plan with provisions was admitted, and it indicates that none of them are court-ordered. While Scott was ordered to pay child support and he testified that he was behind but was trying to catch up, TDPRS did not seek termination under subsection 161.001(1)(F) for failure to pay support. And importantly, a subsection 161.001(1)(O) predicate violation applies to provisions and actions for the parent "as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child."[9] At trial Noble unequivocally *706 testified that S.A.P. was not removed for abuse or neglect by Scott or Rebecca, that S.A.P. was not abused or neglected by Scott or Rebecca, and that S.A.P. was removed only because of the risk because of Scott's and Rebecca's prior history. There is thus no evidence to support the application of subsection 161.001(1)(O) to this case, much less the jury's affirmative finding.
For the above reasons, no reasonable trier of fact could form a firm belief or conviction that Scott committed a predicate violation of subsection 161.001(1)(O), and we must conclude that the evidence is legally insufficient to support the jury's finding. We therefore sustain Scott's fifth issue (5-B) in this respect.

D. The Findings as to Rebecca
For Rebecca, the trial court's judgment found two predicate violations under section 161.001(1):(1) that she engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (TEX. FAM.CODE ANN. § 161.001(1)(E)); and (2) that Rebecca had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of sections 161.001(1)(D) or (E) of the Texas Family Code (TEX. FAM.CODE ANN. § 161.001(1)(M)).
Because Rebecca does not dispute the existence of the prior termination, and because we have rejected her collateral attacks against that prior termination, we hold that section 161.001(1) is satisfied by the jury finding under section 161.001(1)(M) that her parent-child relationship was terminated with respect to another child (E.R.W. and/or T.M.W.) based on a finding that her conduct was in violation of sections 161.001(1)(D) or (E). Because we could affirm the trial court's judgment based on only the predicate violation under section 161.001(1)(M), we need not address Rebecca's first issue on the sufficiency of the evidence to support the jury's finding under section 161.001(1)(E). See K.A.S., 131 S.W.3d at 225; Salas v. Texas Dep't Prot. & Reg. Servs., 71 S.W.3d 783, 792 (Tex.App.-El Paso 2002, no pet.); TEX.R.APP. P. 47.1.

E. The Findings as to Best Interest of the Child
In addition to a predicate violation, TDPRS must establish by clear and convincing evidence that termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001. Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:
(1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future;
(4) the parental abilities of the individuals seeking custody;
(5) the programs available to assist these individuals to promote the best interest of the child;
(6) the plans for the child by these individuals or by the agency seeking custody;
(7) the stability of the home or proposed placement;
(8) the acts or omissions of the parent which may indicate that the existing parent-child *707 relationship is not a proper one; and
(9) any excuse for the acts or omissions of the parent.
Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). These factors are not exhaustive, and some of the listed factors may be inapplicable to some cases, while other factors not listed may also be considered when appropriate. C.H., 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. Id. On the other hand, the presence of scant evidence relevant to each Holley factor will not support such a finding. Id. The Holley factors focus on the best interest of the child, not the best interest of the parent. Dupree, 907 S.W.2d at 86 (citing D.O. v. Tex. Dep't of Human Servs., 851 S.W.2d 351, 358 (Tex.App.-Austin 1993, no writ)). But there is a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. Swate, 72 S.W.3d at 767. The goal of establishing a stable permanent home for a child is a compelling state interest. Dupree, 907 S.W.2d at 87.
Rebecca asserts in her second issue and Scott asserts in his fifth issue (5-C) that the evidence is legally and factually insufficient to support the jury's findings and the trial court's judgment that termination of their parent-child relationships with S.A.P. is in his best interest.
Noble and the CASA volunteer caseworker both testified that termination would be in the best interest of S.A.P., but the CASA caseworker said that her recommendation for Rebecca would possibly be different if Rebecca were not married to Scott. Noble said that Rebecca had a better potential to get S.A.P. back if she had separated from Scott. Noble candidly testified that termination, rather than reunification, became the recommendation of TDPRS because she ran out of time to work with Rebecca and Scott with a dismissal date of December 2002 looming. Noble said that a concern with Scott was that he would not acknowledge his responsibility for the overall care of his children; he was a poor candidate for parenting and it would be difficult for him to make the necessary gains to be a good candidate.
Noble said that in the visits with S.A.P., early on Scott made age-inappropriate comments about S.A.P., but his comments and expectations were appropriate as S.A.P. got older. Noble said that in these visits, Scott appeared to TDPRS to be appropriately and acutely aware of S.A.P.'s needs and the things that were happening to S.A.P. Noble said that for the most part, Scott and Rebecca were appropriate in their interaction with S.A.P. during visits. She said that Rebecca participated "very well" in the visits. He and Rebecca cooperated and participated in the TDPRS service plans, although they were inconsistent in attending plan services.
Noble testified that S.A.P. had been with the same foster parents for 18 months and that they were very bonded with him. She said that S.A.P. does not have any special needs and is very adoptable. Noble said that it was in S.A.P.'s best interest to have him placed for adoption and not be in long-term foster care.
Dr. Brunn diagnosed Scott with a narcissistic personality disorder  "very egocentric and self-inflated"  with schizoid features, meaning that he has difficulty making relationships with other people. Dr. Brunn explained that people with a narcissistic personality disorder have "a difficult time seeing other people's point of view to the extent that it can cause problems with them in many areas of their life.... [T]hey are focused exclusively on their own point of view and what is good *708 for them." She also said that such people "frequently have difficulty with parenting because it's difficult for them to put the child's needs first." Dr. Brunn admitted that she cannot say if Scott was going to be a poor parent to S.A.P. or how he would behave in the future; she said that no test could tell what his behavior toward S.A.P. would be, but that the personality test (the MMPI) does objectively address a person's ability to parent in terms of the parent's personality characteristics. Dr. Brunn opined that Scott was a poor candidate for parenting because of his low frustration intolerance and poor impulse control. She said that it would be difficult for Scott to be a good parent because he might not be able to fully appreciate what he could do in terms of changing himself to resolve any future problems arising with S.A.P., such as Scott's concern about S.A.P.'s thumb-sucking.
Dr. Brunn also testified that Scott had "paranoid personality features" and was delusional, that he complained about how things were done in Texas, and that "he was talking about how somehow George Bush was involved." Scott denied making statements about George Bush's involvement. She said that Scott didn't see a problem with himself and that he believed his only problems were with TDPRS. Dr. Brunn said that both Scott and Rebecca had inappropriate expectations for the age level of S.A.P. Dr. Brunn told Rebecca that she needed to think about having to make a choice between S.A.P. and Scott, but Rebecca would not focus on that possibility, which Dr. Brunn attributed to Rebecca's dependency on Scott.
Dr. Brunn evaluated Rebecca and provided her with about 17 psychotherapy sessions from November 2001 to June 2002. While Rebecca participated in the counseling and cooperated to the extent that she was able to, Dr. Brunn was not satisfied with Rebecca's progress and stopped the therapy. She and Rebecca had a reasonably good working relationship. Dr. Brunn diagnosed Rebecca with a dependent personality disorder with schizoid features. She said that Rebecca was naive and very dependent on Scott, which she saw as a problem, given her diagnoses and opinions on Scott.[10] Dr. Brunn also expressed concern over Rebecca's reading and writing problems and her inability to comprehend advice and recommendations that Dr. Brunn was giving her on parenting matters such as child development expectations for S.A.P., which was another area in which Dr. Brunn thought that Rebecca was mistakenly dependent on Scott. Dr. Brunn thought that the combination of Scott's narcissistic personality and Rebecca's dependent personality was not in the best interest of S.A.P. Dr. Brunn was not comfortable opining on termination. Dr. Brunn testified that Rebecca loved S.A.P. and visited him as often as *709 she was allowed to. Dr. Shinder said that many persons with dependent personality disorder can go on to be good parents.
Rebecca testified that when she was a child, she had been sexually abused by her father and brother and that she had attempted suicide twice because of her father's sexual abuse. She said that she has forgiven her father. She received testing at Dr. Brunn's office, and she was not put on any psychiatric medications. She has never been treated for psychiatric problems.
Dr. Shinder likewise diagnosed Scott with a narcissistic personality disorder, describing him as an impulsive person who thinks that he is always right. He testified that Scott's personality problems made it difficult to function as a parent, keep a job, and get along with others. Dr. Shinder said that there is not a good likelihood that a person with narcissistic personality disorder can be a good parent. Scott also talked with Dr. Shinder of conspiracies against him. Dr. Shinder was concerned about Scott's ability to stay employed and to maintain a stable home. He testified that it would be in S.A.P.'s best interest if Scott's parental rights were terminated.
Kenneth Watson, a therapist in Dr. Shinder's office, saw Scott 28 times over seven months. Watson said that Scott did not make adequate progress in therapy and that he was not successful in getting to where he thought Scott could get custody of S.A.P. Watson listed as Scott's strengths his stable home and employment and his commitment to Rebecca. Watson also noted Scott's willingness to dialogue and talk about his problems and his consistency in coming to therapy; Scott tried to comply with the process. Scott had no drug or alcohol problems. Watson testified that Scott became disruptive on two or three occasions because of Watson's negative evaluations of Scott to TDPRS, that he would become hostile, agitated, and accusatory, and that he would "blame the system, blame our office, blame his ex-wife," for his circumstances.
Rebecca and Scott were separated at the time of S.A.P.'s birth because he became involved with another woman, whom Scott began seeing about halfway through Rebecca's pregnancy with S.A.P. Rebecca said that they were also having lots of arguments because she was blaming herself for losing her two children. Scott, however, still took Rebecca to her prenatal doctor's appointments. They also took "Lamaze" classes together. Rebecca testified that at a TDPRS team meeting in March 2002 relating to S.A.P., she was asked to consider distancing herself from Scott. At trial Scott said that the relationship with the other woman was over.
At the time of trial Scott was working full time in the Army, but he previously had and lost a number of jobs. Scott said that since S.A.P.'s birth, he had worked at four different places. He initially would not answer why he was fired from one job, later saying that it was under secret military investigation because the company's owners were Iranians and had asked him about American troop deployments. Rebecca said that since S.A.P.'s birth, she had held five different jobs and had been terminated from three of them.
Rebecca testified that S.A.P. needs to be with his mom and dad and that she and Scott can provide him with a stable and safe home. She said that she has matured from what happened with her first two children. She said that she had tried to do everything that TDPRS had asked of her to get S.A.P back. Rebecca also took and completed the Campfire parenting class.
Scott voluntarily attended weekly parenting classes through Campfire, and Derrick *710 Dickerson of Campfire said that Scott participated in the classes and paid attention, although he did not attend consistently and did not complete the program. Scott said that he would be willing to attend additional parenting classes and therapy. Scott investigated programs, activities, and benefits available to his family through the military, and he planned on remaining in the military to have access to those things for S.A.P. He was earning $1,900 a month, and the military provided medical and dental care for him and his family.
Lupe Galvez, the minister who married Scott and Rebecca and a former law enforcement officer for thirty years, testified that he was comfortable enough with them to place them in children's ministry after training. He observed Scott and Rebecca in a visit with S.A.P. and said that they showed love for S.A.P. and that Scott was very gentle and humble with S.A.P. and they interacted with each other. He said that with training, Rebecca could be a good mother to S.A.P.
On the jury's findings against Scott and Rebecca that termination of their parent-child relationships with S.A.P. would be in his best interest, considering all the evidence in the light most favorable to the jury's findings, we find that a reasonable trier of fact could have formed a firm belief or conviction that these findings were true. J.F.C., 96 S.W.3d at 266. We overrule their no-evidence complaints.
On their factual-sufficiency complaints, having reviewed all the evidence in a neutral light, we have considered whether the disputed evidence is such that a reasonable trier of fact could not have resolved that disputed evidence in favor of the jury's findings. We conclude that, in light of the entire record, the disputed evidence that a reasonable trier of fact could not have credited in favor of the findings is so significant that a trier of fact could not reasonably have formed a firm belief or conviction that termination of their parent-child relationships with S.A.P. would be in his best interest.
Our conclusion is based on the disputed evidence set out above and, in the context of the Holley factors, as follows:
(1) Desires of the child: S.A.P. was too young to express any desires.
(2) Emotional and physical needs of the child now and in the future: S.A.P. has no special emotional and physical needs. He has been with the same foster parents for eighteen months, and they have bonded. In visits, Rebecca and Scott overall acted appropriately with S.A.P.
(3) Emotional and physical danger to the child now and in the future: Noble testified that S.A.P. had not been abused or neglected by Scott or Rebecca. Dr. Shinder and Dr. Brunn testified about their concerns about Scott's ability to care for S.A.P. in the future. Dr. Brunn admitted that she could not predict Scott's future parental behavior toward S.A.P.
(4) Parental abilities of the individuals seeking custody: The evidence on this factor is discussed above at length. There was substantial evidence against Scott's and Rebecca's parental abilities with the histories of their other children, but there was also evidence of their attempts to improve, especially on Rebecca's part. Dr. Brunn said that Rebecca loved S.A.P. and visited him as much as she could, and Dr. Shinder said that persons with a dependent personality disorder can be a good parent. The principal concern of Dr. Brunn and TDPRS with Rebecca was that she had not separated from Scott and instead had married him, a matter that we address below. Neither Scott nor Rebecca had current problems with drugs or alcohol, and their mental health problems were *711 remote. Both participated in all the services that TDPRS had requested, including psychological testing and evaluation and individual therapy. Notably, TDPRS did not send them to parenting classes.
(5) Programs available to assist these individuals to promote the best interest of the child: Scott had located a considerable number of programs, benefits, and family activities in the military. Both had attended the Campfire parenting classes voluntarily. And while they were ultimately unsuccessful with Rebecca's other two children, Scott and Rebecca had at least sought help from MHMR, TDPRS, and private agencies for them.
(6) Plans for the child by these individuals or by the agency seeking custody: The TDPRS plan was to place S.A.P. for adoption, noting that he was quite adoptable. But Noble admitted that TDPRS ultimately sought termination because she had run out of time to work with Scott and Rebecca and was faced with having to dismiss the case. Scott and Rebecca married several months before trial and looked forward to a family with S.A.P. Scott intended on remaining in the military to have access to the numerous activities and benefits available from the military.
(7) Stability of the home or proposed placement: TDPRS proposed that adoption would give S.A.P. stability. Rebecca and Scott had been in the same home for about three years and had recently married. While they had separated during Rebecca's pregnancy with S.A.P., Scott still took her to her prenatal doctor's appointments and they attended birthing classes together. They both had prior unstable employment, but Scott had just been called to active military status and planned on a permanent military career. Watson, Scott's therapist, credited Scott's stable home and employment and his commitment to Rebecca.
(8) Acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one: We have extensively discussed Rebecca's and Scott's histories with their other children, and their histories militate against them on this factor, but Noble's testimony on their conduct during their visits with S.A.P. was overall positive.
(9) Any excuse for the acts or omissions of the parent: Rebecca testified that she had no idea that Rosy would abuse and neglect E.R.W. and T.M.W. Both Rebecca and Scott testified that they brought E.R.W. and T.M.W. to TDPRS and left them because of the TDPRS letter to New York social services. One of the principal criticisms of TDPRS and Dr. Brunn about Rebecca's post-removal conduct was that she would not separate from Scott and then she even married him, but the record is clear that the trial court urged them to marry for S.A.P.'s benefit and this was a factor in their decision to marry.
Viewing all the evidence in a neutral light in relation to the Holley factors, the jury could not have reasonably formed a firm belief or conviction that termination of their parent-child relationships with S.A.P. was in his best interest. Accordingly, the evidence is factually insufficient on the jury's best-interest findings against Scott and Rebecca. We thus sustain Scott's fifth issue on the point (5-C) and Rebecca's second issue.

VIII. Conclusion
Having sustained Rebecca's second issue and Scott's fifth issue, we reverse the trial court's judgment and remand this cause for a new trial.
Chief Justice GRAY dissenting.
*712 TOM GRAY, Chief Justice, dissenting.
There is much that I could say about the majority's opinion. I could detail their hostility generally to termination suits. I could discuss the structure and presentation of the evidence in the opinion to push the reader to the result. I could discuss the long effort to ever so subtly shift the standard of review. But it would not matter.
You see, what matters here is that they disagree with the jury, the trial judge, and me and have reversed this case on an issue, factual sufficiency, that makes it almost impossible for review because the Texas Supreme Court does not have jurisdiction to review a factual sufficiency determination. I do believe that the standard of review, while carefully quoted and discussed, was not properly applied. But because of the way the opinion is constructed, it is difficult to identify what evidence was disputed, if any, what evidence was undisputed, and upon what factor of element the evidence was applicable or considered by the majority. The primary shortcoming in the opinion is the failure to segregate or identify the disputed evidence that a reasonable fact finder could not have reasonably resolved in favor of the jury's answer, which evidence is what shifts the jury's answer from being a finding supported by legally sufficient evidence to an answer not supported by factually sufficient evidence. In the Interest of M.A.H., 2004 WL 1691097, 2004 Tex. App. Lexis 6913, *15-22 (Tex.App.-Waco July 28, 2004, no pet.); see In the Interest of C.H., 89 S.W.3d 17 (Tex. 2002).
Just dumping all the evidence out in the opinion and then drawing the conclusion desired for the result hardly complies with the express requirement of In the Interest of J.F.C. to "detail in its opinion why it has concluded that a reasonable factfinder could not have credited the disputed evidence in favor of the finding." In the Intreest of J.F.C., 96 S.W.3d 256, 267 (Tex. 2002). After all, the only difference in a legal sufficiency review and a factual sufficiency review in a termination case is how the disputed evidence is evaluated and, of course, the inability of the Texas Supreme Court to conduct a factual sufficiency review.
When this case left here the first time, almost 16 months ago, I felt fairly certain that it would come back, and even more certain that if it did, I could again have to dissent. But today, I fear that S.A.P.'s fate, which has been cast into uncertainty by two judges who have simply reweighed the evidence, will be to languish longer in that uncertainty.
Upon the same record that the majority has reviewed, indeed even as the facts are presented in this opinion to push the reader to their desired result, I have no trouble in determining that the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the State's allegations. In the Interest of J.F.C., 96 S.W.3d. 256, 266 (Tex. 2002); In the Interest of C.H., 89 S.W.3d 17, 25 (Tex. 2002).
NOTES
[1] Scott and Rebecca married in the interim between S.A.P.'s birth and the termination trial; Scott's paternity of S.A.P. was never an issue.
[2] The attorney-ad-litem for S.A.P. has notified us that he supports the position of TDPRS in this appeal and urges us to affirm the judgment terminating Scott's and Rebecca's parental rights.
[3] If a reliability challenge is restricted to the face of the record  for example, to expert testimony that is allegedly speculative or conclusory on its face  a party may challenge the legal sufficiency of the evidence even in the absence of any objection to its admissibility. Coastal Transport Co. v. Crown Central Petroleum Corp., 136 S.W.3d 227, 233 (Tex.2004).
[4] In a July 19, 2001, Temporary Order, the trial court ordered Scott (and Rebecca) to submit to and cooperate fully in the preparation of a court-ordered psychological or psychiatric evaluation and a court-ordered parenting assessment. At a December 4, 2001 hearing, Scott told the trial court that he was having a scheduling conflict between his job and attending counseling under the prior referral and that he was concerned about losing his job. The trial court thus ordered Scott to attend counseling with Dr. Shinder or his staff, who were flexible in scheduling counseling sessions.
[5] After being served, Frederick Crowell, the father, corresponded with the trial court and an attorney was appointed to represent him.
[6] Section 161.211 provides:

DIRECT OR COLLATERAL ATTACK ON TERMINATION ORDER.
(a) Notwithstanding Rule 329, Texas Rules of Civil Procedure, the validity of an order terminating the parental rights of a person who has been personally served or who has executed an affidavit of relinquishment of parental rights or an affidavit of waiver of interest in a child or whose rights have been terminated under Section 161.002(b) is not subject to collateral or direct attack after the sixth month after the date the order was signed.
(b) Notwithstanding Rule 329, Texas Rules of Civil Procedure, the validity of an order terminating the parental rights of a person who is served by citation by publication is not subject to collateral or direct attack after the sixth month after the date the order was signed.
(c) A direct or collateral attack on an order terminating parental rights based on an unrevoked affidavit of relinquishment of parental rights or affidavit of waiver of interest in a child is limited to issues relating to fraud, duress, or coercion in the execution of the affidavit.
TEX. FAM.CODE ANN. § 161.211.
[7] Cf. In re Cochran, 151 S.W.3d 275, 279-81 (Tex.App.-Texarkana 2004, orig. proceeding) (holding that evidence at 14-day hearing was insufficient for trial court to deny parents possession of newborn, despite prior terminations of mother's nine other children and father's three other children, because parents' most recent conduct occurred 14 months before newborn's birth and there was no evidence that current conditions were a danger to newborn's health or safety).
[8] Scott and Rebecca both expressed a concern that S.A.P. could lose his thumb because of thumb-sucking; they said it was reddish and it looked like he had trouble using it, and they claimed they had been told this by doctors and nurses.
[9] Subsection 161.001(1)(O) provides in whole:

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence: (1) that the parent has:
...
(O) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Protective and Regulatory Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.
TEX. FAM.CODE ANN. § 161.001(1)(O).
[10] Despite the concerns of TDPRS and Dr. Brunn about Scott, Rebecca married Scott in July 2002, a few months before trial. She said that she and Scott married because the judge had suggested they get married. At a December 4, 2001 hearing, the following exchange occurred:

[Scott]: Can I make a statement? She's not my wife.
[Rebecca]: Yeah. We're not married.
THE COURT: What is she?
[Rebecca]: I'm his girlfriend. I'm not married to him.
THE COURT: But you're the mother of the children?
[Rebecca]: Yes, but we're not married.
THE COURT: Do you think it might be to the benefit of the children if you're going to be together that you get married?
[Scott]: I'm in the process, Your Honor.
[Rebecca]: We're working on that.
THE COURT: Well, I would suggest that you ask her and I suggest that you say yes.
Noble was at that hearing and recalled this exchange.