# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00521-CV

**Melissa Bennett, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM COUNTY COURT AT LAW OF BASTROP COUNTY
### NO. 06-10474, HONORABLE H. R. TOWSLEE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Melissa Bennett appeals from the trial court's order terminating her parental rights to her two children, A.J. and J.M., after a jury found that such rights should be terminated. On appeal, Bennett argues that the trial court erred in excluding evidence that placement with Donna and Brad Zimmerhanzel, the potential adoptive parents, was not in the children's best interest. Bennett also argues that the evidence was legally and factually insufficient to establish a statutory ground for the termination of her parental rights and to establish that termination is in the best interest of the children. Because we have determined that the trial court did not err in excluding evidence regarding the suitability of the Zimmerhanzels as adoptive parents and that the evidence was both legally and factually sufficient to establish (1) statutory grounds for termination and (2) that termination is in the children's best interest, we affirm the trial court's order of termination.

## BACKGROUND

The Department of Family and Protective Services (the "Department") brought suit for termination of parental rights against Melissa Bennett, the mother of A.J. and J.M.; Todd Johns, the father of A.J.; and Josh Miller, the alleged father of J.M. Brad and Donna Zimmerhanzel, the paternal aunt and uncle of A.J., intervened to protect their interest in adopting both of the children.

Bennett's involvement with the Department began in January 2006, when Bennett brought J.M., who was seven weeks old at the time, to the emergency room because his left leg was swelling. J.M. was transported to Brackenridge Children's Hospital, where doctors discovered that he had suffered a fractured femur in his left leg, as well as fractured tibias in both legs and a lesion on one of his ribs that appeared to be an older, healing fracture.

Dr. George Edwards, who treated J.M., testified that when J.M. was admitted to the hospital, Bennett and Miller maintained that they did not know how the injuries had occurred, although Bennett suggested that she could have rolled over onto J.M. while she was sleeping. Dr. Edwards testified that the femur fracture was an oblique or spiral fracture, meaning that it was caused by a torque or twisting motion. He further testified that J.M.'s injuries were suggestive of a non-accidental trauma, and that because J.M. was not old enough to crawl or roll over on his own, he could not have produced such injuries himself.

A.J., who was five years old at the time J.M. was admitted to the hospital, was interviewed separately regarding her brother's injuries. Kristi Meccia, a Department case worker who was called to the hospital as a result of the injuries, testified that A.J. reported incidents of domestic violence between Miller and Bennett.

2

In addition to J.M.'s injuries, the Department was also concerned about Bennett's history of drug use and relationships involving domestic violence. Bennett testified that Johns, A.J.'s father, was physically abusive toward Bennett during their marriage. Bennett ended her relationship with Johns in 2001, when A.J. was approximately one year old. In May 2004, Bennett put A.J. in the care of Johns and his mother, in order to enter an in-patient treatment program for an addiction to methamphetamine. Bennett testified that she completed the treatment program, but briefly relapsed in late 2004. Around the time of her relapse, she became involved with Miller, who was also addicted to methamphetamine, had recently been released from prison, and had a history of violent behavior. She further testified that she stopped using methamphetamine completely in December 2004. The only other evidence of Bennett's drug use was her testimony that she smoked marijuana on a single occasion in January 2006, after a physical altercation with Miller.

In May 2005, Bennett retrieved A.J. from the home of Johns's mother, where A.J. was living at the time. From May 2005 until the children were removed in January 2006, A.J. lived with Bennett and Miller. J.M. was born in December 2005. Bennett testified that Miller was physically abusive toward her, including an incident in which he threw a lighter at her while she was holding J.M. She further testified that Miller never physically abused A.J.

A.J. and J.M. were initially placed in foster care after their removal from Miller and Bennett's home. In April 2006, they were placed with Brad and Donna Zimmerhanzel, A.J.'s paternal aunt and uncle.

After the children were removed, Bennett and Miller enrolled in a counseling program, as required by the Department's service plan. Bud Hibbs, the counselor working with both

3

parents, advised Bennett that she should not attempt to protect Miller by concealing any responsibility he may have had for J.M.'s injuries. After a few counseling sessions, Bennett ended her relationship with Miller and reported the incident that she believed may have caused the injuries. Bennett stated that approximately two weeks before J.M. was admitted to the hospital, Miller and Bennett had been arguing because Miller wanted to go to his mother's house with J.M., while Bennett opposed the idea. During this argument, there was a "tug-of-war" incident in which Miller and Bennett pulled J.M. in opposite directions.

In August 2006, Bennett moved to Kosse, Texas, near her father's home, where she was able to secure suitable housing, obtain employment in a feed store, and attend the classes required by her Department service plan. She briefly lived with a new boyfriend, Michael Crutcher, but ended this relationship when the Department informed her that he had a criminal history and had been released from prison within the previous year.[1] All of her drug tests during this time period came back negative and her supervised visits with the children were considered successful. As a result, in December 2006, the Department recommended an increased visitation schedule, with the stated goal of eventually returning both A.J. and J.M. to Bennett's care.

However, in February 2007, Bennett was laid off from her employment. Her therapist at the time, Dr. Richard Brunn, testified that the loss of her job caused Bennett to become depressed. As a result of her depression, Bennett reduced her visits with the children, failed to maintain contact with her Department case worker, missed two drug tests, and eventually ceased visitation altogether.

---

[1] It is disputed whether Bennett actually ended her relationship with Crutcher after learning of his criminal history because some of Crutcher's belongings remained at Bennett's residence. Bennett testified that she merely allowed Crutcher to store items at her house because he was living with friends and had no storage space.

4

Due to Bennett's failure to fulfill the requirements of her service plan in the spring of 2007, the Department changed its recommendation from family reunification to termination of Bennett's parental rights.

Prior to trial, both Johns and Miller signed affidavits of voluntary relinquishment of their parental rights regarding A.J. and J.M., respectively. Johns executed a Rule 11 agreement with the Department stating that the Department would not seek termination of either Johns's or Miller's parental rights unless Bennett's rights were also terminated. Miller, who was incarcerated at the time of trial, did not sign this agreement.[2]

Due to the voluntary relinquishments signed by the fathers, only the case of Bennett's parental rights was tried to the jury. Johns was aligned with the Department at trial, while Miller did not participate. After a five-day trial, the jury found that Bennett's parental rights should be terminated. The trial court entered judgment on the verdict, entered judgment against the fathers based on their voluntary relinquishments, and appointed the Department as permanent managing conservator. Bennett's motion for new trial was denied and this appeal followed.

## STANDARD OF REVIEW

The inclusion and exclusion of evidence is committed to the trial court's sound discretion. *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). The mere fact that the trial court exercised

---

[2] Miller was incarcerated after a conviction for engaging in organized criminal activity. However, at the time of trial, he had also been indicted for inflicting J.M.'s injuries.

5

its discretion in a different manner than appellate courts have done in similar circumstances does not demonstrate an abuse of discretion. *Id*. at 42.

In a legal-sufficiency review of a termination case, we must look at all the evidence in the light most favorable to the jury's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the factfinder resolved disputed facts in favor of its finding where a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* We may not substitute our judgment for the jury's, and we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *City of Keller v. Wilson*, 168 S.W.3d 802, 819, 822 (Tex. 2005).

Evidence is factually sufficient in termination cases if the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard "retains the deference an appellate court must have for the factfinder's role." *Id*. at 26. In a factual-sufficiency review, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Landry's Seafood House-Addison, Inc. v. Snadon*, 233 S.W.3d 430, 436 (Tex. App.—Dallas 2007, pet. filed).

**DISCUSSION**

*Exclusion of Evidence*

Bennett argues that the trial court erred in excluding evidence that Brad Zimmerhanzel had a history of substance abuse and domestic violence, which the trial court

6

excluded on relevancy grounds.[3] Bennett claims that the jury needed information about the Zimmerhanzels in order to determine whether the children's best interests lie with their return to their mother or with post-termination adoption by the Zimmerhanzels.

The issue of the children's post-adoptive placement was introduced during opening statements, when the Department suggested that the Zimmerhanzels could provide a safe and stable home for the children. Bennett objected, noting that there was no guarantee what would happen to the children in the event of termination, and the court responded, "I agree with it. That's not what this case is about. I sustain the objection." In a subsequent bench conference, the court stated:

> [T]here's no guarantee that [the Zimmerhanzels] will adopt. And what bothers me, and I think probably what bothers the jury, too, is—and that is, here we're going to compare one parent with prospective parents and say, well, if they wouldn't be in the home of the Zimmerhanzels, instead of where they are right now—I think what we need to look at in this case is whether or not you have grounds to terminate the parental rights of the mother at this point.

Throughout the remainder of the trial, the court not only excluded Bennett's evidence attacking the suitability of the Zimmerhanzels as adoptive parents, but also any evidence the Department attempted to present in support of the Zimmerhanzels as adoptive parents.

Evidence which is not relevant is inadmissible. Tex. R. Evid. 402. To be considered relevant, the offered evidence must logically tend to make more or less likely a particular proposition that is of some consequence to some issue in the trial. Tex. R. Evid. 401.

---

[3] The excluded evidence, which Bennett's counsel preserved in a bill of exceptions, certainly raised legitimate questions about the suitability of the Zimmerhanzels as adoptive parents. This evidence included numerous detailed police reports regarding episodes of domestic violence at the Zimmerhanzel residence.

The sole issue at trial was whether Bennett's parental rights should be terminated. Termination of parental rights merely clears the way for the possibility of an adoption, which would have to be decided in a separate proceeding and which, as all parties agreed, would not necessarily result in adoption by the Zimmerhanzels. Therefore, we agree with the trial court's determination that the merits of a prospective adoptive home are irrelevant to the issue of whether Bennett's parental rights should be terminated.[4] Because the trial court did not abuse its discretion in excluding evidence related to the suitability of the Zimmerhanzels as adoptive parents, Bennett's first point of error is overruled.

*Sufficiency of the Evidence: Statutory Grounds for Termination*

In order for a court to terminate parental rights, the Department must show, by clear and convincing evidence, that at least one of the twenty statutory grounds for termination applies. Tex. Fam. Code Ann. § 161.001(1)(A)-(T) (West Supp. 2007). The trial court must also find that termination is in the best interest of the children. *Id*. § 161.001(2) (West Supp. 2007). In her second point of error, Bennett argues that the evidence is legally and factually insufficient to establish statutory grounds for termination.

The trial court granted termination of Bennett's parental rights on the grounds that Bennett had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, (2) engaged in conduct or

---

[4] This Court previously addressed facts similar to the present case and came to the same conclusion, stating that "the trial court did not abuse its discretion in excluding evidence regarding the suitability of the current foster home and possible adoptive placement." *Sharp v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-96-00292-CV, 1997 Tex. App. LEXIS 3181, at *7 (Tex. App.—Austin June 19, 1997, no writ) (not designated for publication).

knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children, or (3) failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, who had been in the temporary managing conservatorship of the Department for not less than nine months. *See id*. § 161.001(1)(D), (E), (O).

The first two statutory grounds—placing the children in dangerous surroundings and knowingly placing them with people whose conduct endangers the children—can both be established by the evidence showing that Bennett had a pattern of exposing the children to men with histories of violent crime, drug use, and/or domestic violence—namely Johns, Miller, and Crutcher.[5] This pattern eventually resulted in J.M. suffering severe injuries in an altercation between Bennett and Miller.[6]

In addition, Bennett demonstrated a lack of candor to the authorities regarding J.M.'s injuries. When questioned at the hospital about possible causes of the injuries, Bennett failed to reveal the "tug-of-war" incident, but merely suggested that she may have rolled over onto J.M. while sleeping in the same bed. According to Bennett's testimony, the tug-of-war incident occurred approximately two weeks prior to the time she took J.M. to the hospital. Dr. Edwards testified that this type of altercation could explain J.M.'s injuries, stating, "[I]t would have to have been very

---

[5] The Department also introduced evidence that Bennett had moved in with another boyfriend in the spring of 2007, who also had a criminal history. Bennett testified that her relationship with this individual was over by the time of trial, and there is no evidence that he had a history of drug use or domestic violence.

[6] Bennett also testified to a separate incident in which Miller threw a cigarette lighter at her while she was holding J.M., but stated that she was able to twist her body so that the lighter hit her rather than J.M. There was no evidence that J.M. was injured by that particular incident.

violent to result in three different skeletal injuries. And I would certainly think that a reasonable person would have had sufficient awareness of such—that such a violent situation might result in harm to the child."

Unexplained broken bones in an infant have been considered legally sufficient to uphold a judgment of termination under section 161.001(1)(D), even in light of evidence that the parent sought medical treatment for the infant. *In re J.P.B.*, 180 S.W.3d at 574.

Furthermore, while there was no evidence that A.J. was ever physically abused, a parent's conduct does not necessarily have to be directed at the child, nor is the child required to actually suffer injury, to support a finding that the child was endangered. *See Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

In addition to the violent home environment, Bennett's history of drug use further establishes that she placed the children in dangerous surroundings or engaged in conduct that endangered the children. Bennett testified that she left A.J. with Johns and his mother—who was also A.J.'s grandmother—while she struggled with an addiction to methamphetamines, "because [she] didn't think [her] daughter deserved to be in that atmosphere." After completing an in-patient rehabilitation program, Bennett relapsed. However, Bennett testified that she stopped using methamphetamine completely in December 2004.[7] Her drug test results are consistent with this testimony.

A history of drug addiction may establish an endangering course of conduct, even if the parent is drug-free at the time of trial. *In re T.N.S.*, 230 S.W.3d 434, 439

---

[7] As previously noted, Bennett also admitted to smoking marijuana on a single occasion in January 2006, after an altercation with Miller.

(Tex. App.—San Antonio 2007, no pet.). Furthermore, a child's emotional and physical well-being can be endangered when a parent's drug addiction leads to uncertainty and instability in the child's life, such as the possibility of being left alone when a parent enters a drug rehabilitation program. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied).

In reviewing the legal sufficiency of the evidence, we look at all evidence in the light most favorable to the finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence at trial showed that Bennett had a pattern of exposing her children to a violent home environment, including an incident of domestic violence that resulted in J.M. suffering severe injuries. It also showed that Bennett had a history of drug addiction, had left A.J. in the care of relatives[8] in order to enter a rehabilitation program, and had relapsed shortly after completing the program.

The evidence in Bennett's favor included the testimony of a counselor, Bud Hibbs, who stated that Bennett "booted" Miller from her life after a counseling session in which Hibbs informed Bennett that it was not in her best interest to conceal Miller's responsibility for J.M.'s injuries. However, the evidence also shows that Bennett did conceal Miller's responsibility for J.M.'s injuries when initially questioned at the hospital and that she allowed two weeks to pass after the tug-of-war incident before obtaining medical attention for J.M.'s severe fractures. Viewing the evidence in the light most favorable to the jury's finding, a reasonable factfinder could have resolved this conflict in favor of a finding that Bennett allowed the children to be in a harmful environment and allowed them to be in the presence of people whose conduct endangered their safety, despite the fact that she later "booted" Miller from her life.

---

[8] More specifically, Bennett left A.J. in the care of Johns, who had been physically abusive toward Bennett during their marriage.

11

Further evidence in Bennett's favor was her testimony that she ended her relationship with Crutcher immediately upon learning of his criminal history from the Department. This evidence was contradicted by her testimony that some of Crutcher's belongings remained at her house for several months after she claims to have ended the relationship. Again, viewing the evidence in the light most favorable to the jury's finding, a reasonable factfinder could have resolved this conflict by determining that Bennett did not in fact end the relationship with Crutcher immediately upon learning of his criminal history. Furthermore, a reasonable factfinder may have been persuaded by the Department's argument that Bennett, who was seeking to have her children returned to her at that time, should have investigated Crutcher's criminal history herself before allowing him to move into her home.

Regarding Bennett's drug use, the evidence in her favor was that she had passed each of her court-ordered drug tests since the children's removal. However, Bennett also failed to show up to required drug tests in April and May 2007, which were recorded as positive results pursuant to Department policy. A reasonable factfinder could have interpreted Bennett's failure to show up for drug tests as evidence that she had engaged in drug use. Furthermore, being drug-free at the time of trial does not necessarily negate the effect of evidence of past drug abuse. *See In re T.N.S.*, 230 S.W.3d at 439.

Viewing the evidence in the light most favorable to the verdict, we hold that the evidence was legally sufficient to determine that Bennett had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, and engaged in conduct or knowingly placed the children with persons who

12

engaged in conduct which endangered the physical or emotional well-being of the children. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

In a factual-sufficiency review, we look at the evidence in a neutral light and determine whether a reasonable factfinder could have resolved the evidence in favor of the finding. *In re S.A.P.*, 169 S.W.3d 685, 710 (Tex. App.—Waco 2005, no pet.). Viewing the evidence previously discussed in a neutral light, the evidence in Bennett's favor—her negative drug tests and her willingness to end relationships with both Miller and Crutcher in order to obtain the return of her children—would not prevent a reasonable factfinder from forming a firm belief or conviction that Bennett's past drug addiction and subsequent relapse, as well as her pattern of introducing men with histories of crime and domestic violence into her home, endangered the children. As a result, we hold that the evidence is factually sufficient to determine that statutory grounds exist for terminating Bennett's parental rights under parts (D) and (E) of family code section 161.001(1).

The third statutory ground cited by the trial court for terminating Bennett's rights is her failure to comply with a court-ordered service plan that established the actions necessary for her to obtain the return of her children. *See* Tex. Fam. Code Ann. § 161.001(1)(O). The Department put on evidence that, over a period of eighteen months, Bennett failed to maintain suitable employment, failed to maintain suitable housing, and failed to maintain contact with her case worker.

Bennett concedes that she failed to maintain suitable employment, failed to maintain suitable housing, and failed to maintain contact with her case worker, as required by her service plan. Bennett argues that she substantially complied with her service plan by completing a parenting class, two counseling programs, therapy sessions, a violence-intervention program, and an evaluation of

13

her need for drug rehabilitation services.[9] She was also able to obtain housing and employment for temporary periods while the service plan was in effect, although she was unable to maintain such employment or housing on a more permanent basis. Prior to losing her job at a feed store in February 2007, Bennett had begun making substantial progress toward fulfilling her service plan, as she was employed, attending her required classes, passing her drug tests, visiting the children regularly, and renting a house. However, Bennett testified that after she lost her job, she became depressed and "started to lose hope." It was at this time that Bennett stopped visiting the children, lost contact with her case worker, and failed to show up to two required drug tests. In support of her argument that substantial compliance is sufficient to avoid termination, Bennett points to the testimony of Jill Kammerdiener and Kristi Meccia, two Department case workers who had been assigned to Bennett's case, who both stated that the majority of people do not fully comply with their service plans.

Texas courts have held that substantial compliance is not sufficient to avoid termination for failure to comply with a service plan. *In re T.T.*, 228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("Research reveals that substantial completion or substantial compliance is not enough to avoid a termination finding under this section."); *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied). Furthermore, even if substantial compliance was sufficient to avoid termination, a reasonable factfinder could have determined, in light of Bennett's failure to maintain suitable employment and housing and failure to maintain contact with her case worker, that Bennett's attendance at certain required classes and programs did not constitute substantial compliance. As a result, we hold that the evidence is legally and factually

---

[9] Bud Hibbs, the counselor who evaluated Bennett's need for drug rehabilitation services, recommended that she enter either in-patient or out-patient treatment for chemical dependency. There is no evidence that Bennett followed up on these recommendations.

14

sufficient to determine that Bennett failed to comply with a court-ordered service plan that established the actions necessary for her to obtain the return of her children, a statutory ground for termination of parental rights.  *See* Tex. Fam. Code Ann. § 161.001(1)(O).

In light of our determination that the evidence is both legally and factually sufficient to support all three of the Department's cited grounds for terminating Bennett's parental rights, Bennett's second point of error is overruled.[10]

*Sufficiency of the Evidence: Best Interest of the Children*

Bennett's third point of error is that the evidence is legally and factually insufficient to establish that termination of her parental rights is in the best interest of the children.  *See* Tex. Fam. Code Ann. § 161.001(2).

Bennett argues that the conflicting evidence and recommendations of various witnesses negates proof by clear and convincing evidence that termination is in the children's best interest.

Bennett points out that the children's attorney ad litem did not urge the jury to terminate her parental rights in his closing argument.  Instead, the ad litem described Bennett as a "likeable person" with a supportive family and access to State services, and stated:

> [W]hat you have to ask yourself is whether or not she's able to use what she's got, and that's more than a lot of people have, and that's not necessarily a comment on what I think you should find or do—but what you have to decide is if in spite of all this, do you feel like the evidence has shown that she has the ability to provide a nurturing, stable, safe environment for these children.

---

[10]  While we find that all three of the Department's cited grounds are supported by the evidence in this case, we note that only one statutory ground is necessary to support a termination. *See* Tex. Fam. Code Ann. § 161.001(1) (West Supp. 2007).

As a preliminary matter, counsel's comments during closing do not constitute evidence. *Bazan v. Bazan*, 762 S.W.2d 357, 360 n.3 (Tex. App.—San Antonio 1988, no writ). Furthermore, while the ad litem did not urge the jury to terminate Bennett's parental rights, he also did not advocate that Bennett retain her parental rights. Instead, he gave a neutral closing, simply asking the jury to do what it thinks is best. Even viewing his statement in the neutral light required for a factual-sufficiency review, such a statement would not prevent a reasonable factfinder from forming the firm conviction that termination would be in the children's best interest.

Bennett argues that the testimony of multiple witnesses contradicted a finding that termination of parental rights would be in the children's best interest. Bennett's argument, however, ignores other evidence in the record reflecting that the witnesses testifying in her favor were unaware of many of the relevant facts of her case. Eileen Worst, a case aid worker for Bastrop County, testified that she oversaw seven of Bennett's supervised visits with the children between May 2006 and August 2006. Worst testified that Bennett was "really good with the kids" and that no problems occurred during the visits. However, when Worst was asked if she could speak to the issue of terminating Bennett's rights, she stated, "No, not really, because I don't know what's happened between now and—this and now."

Clyde Nicholas, the pastor of a church Bennett attended in Kosse, testified that in his opinion, Bennett's rights should not be terminated. Nicholas noted that Bennett was under a great deal of "stress and pressure" from the Department, characterizing her experiences with the Department as "a persecution." However, Nicholas later testified that he was not aware of Crutcher or Miller's criminal histories, the history of domestic violence between Bennett and Miller, Bennett's methamphetamine addiction, or the fact that Bennett had ceased visiting the children after she lost

16

her job. After being informed of these circumstances, Nicholas stated, "Well, I only know one side, and that was hers. I didn't know the other side."

Bennett's psychologist, Dr. Richard Brunn, testified that he would recommend that the children be returned to Bennett if she was able to "maintain a domicile and have a job, and keep up the progress she had made." When Brunn was informed that Bennett had stopped visiting the children after losing her job, he stated that this response was not "a very good indicator that progress is being made toward reunification," and that he might not recommend reunification in light of that change in circumstances.

Paige Hankins, a Waco-based courtesy worker[11] for the Department, testified that she did not believe termination of Bennett's parental rights would be appropriate and that Bennett should be given another chance to complete her service plan, stating, "[F]rom what I've seen from her before and her true desire for those children, and her willingness to do anything it took when I was involved with her, I think she does deserve to try to complete these services." Hankins also testified that she had not interacted with the children, and that her work with Bennett was limited to monthly visits and drug tests from November 2006 to February 2007. When asked if she was familiar with Bennett's case, Hankins responded, "I do not know the whole story, I'll be honest with you. I just—my involvement was strictly making sure that on a monthly basis [Bennett] had face to face contact and a drug test done." Hankins further testified that if Bennett had been given multiple

---

[11] When Bennett relocated from the Bastrop area to Kosse, which is near Waco, Hankins was assigned by the Department's Waco office to provide courtesy supervision over Bennett's case, in order to assist the Bastrop conservatorship unit, where the case originated.

17

chances in the past, then her recommendation might change, stating that, "[I]t would be wasting everyone's time if this is just the same song sixth verse or whatever."

In addition to the evidence showing that witnesses testifying in Bennett's favor were unaware of key facts and circumstances, the Department presented multiple witnesses who testified that termination was in the children's best interest. Kristi Meccia, the Department case worker assigned to Bennett's case, testified that Bennett had demonstrated a substantial failure to comply with the court-ordered service plan and that termination was in the children's best interest. Jill Kammerdiener, the Department case worker who had been assigned to Bennett's case before it was transferred to Meccia, also testified that termination was in the children's best interest, based on Bennett's history of involving dangerous men in the children's lives, the fact that the children would have an opportunity to be adopted, and the fact that Bennett had ceased visitation with the children due to her "inability to provide care for them even for a full weekend at a time." Finally, Terry Vaughn, a Court Appointed Special Advocate (CASA) volunteer who worked on Bennett's case, testified that termination of parental rights was in the children's best interest, stating, "Seventeen months have gone by since this case started, when one was actively involved in trying to get [Bennett] back to a point where she could have the children and it hasn't happened."

Bennett asserts that the Department failed to keep up with her recent progress, noting that her case worker was unaware that she had moved to Cedar Park, was currently employed, and had registered to take college courses. However, Bennett's own failure to maintain contact with her case worker, as required by her service plan, was one of the reasons cited by the Department for choosing to pursue termination of Bennett's rights. Furthermore, evidence that a parent has made

18

lifestyle improvements prior to trial does not preclude a finding that termination of parental rights is in the best interest of the children. *In re S.A.W.*, 131 S.W.3d 704, 709 (Tex. App.—Dallas 2004, no pet.).

The evidence at trial showed that Bennett had established a pattern of exposing her children to men with histories of crime and domestic violence, that she had been involved in an altercation with Miller that resulted in J.M. suffering severe injuries, that she did not seek medical attention for J.M. until approximately two weeks after the altercation, that she initially concealed Miller's responsibility for J.M.'s injuries, that she failed to maintain suitable employment and housing while her service plan was in effect, that she ceased visitation with the children after losing her job, that she failed to maintain contact with her case worker, and that she demonstrated a history of drug addiction. Viewing this evidence in the light most favorable to the jury's finding, we hold that a reasonable factfinder could have formed a firm conviction that termination of Bennett's parental rights was in the children's best interest. Therefore, the evidence is legally sufficient to support this finding.

Furthermore, viewing this evidence in a neutral light does not change our determination that a reasonable factfinder could have formed a firm conviction that termination was in the children's best interest. Bennett does not dispute that she failed to maintain contact with her case worker, that she failed to maintain suitable housing or employment, that she placed J.M. in an environment that caused him to sustain severe injuries and subsequently failed to disclose Miller's involvement in those injuries, that she ceased visitation with the children in the spring of 2007, or her past history of drug addiction. Furthermore, the witnesses testifying in Bennett's favor revealed

19

that they were unaware of key facts and circumstances that might change their opinion of the children's best interest. Because the evidence is both legally and factually sufficient to support the jury's finding, we overrule Bennett's third issue.

## CONCLUSION

Because we have determined that the trial court did not abuse its discretion in excluding evidence regarding the suitability of the Zimmerhanzels as adoptive parents, and that the evidence was legally and factually sufficient to establish (1) statutory grounds for termination and (2) that termination is in the best interest of A.J. and J.M., we affirm the trial court's order of termination.

_____

Diane Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed:   April 3, 2008

20