

# IN THE
# TENTH COURT OF APPEALS

### No. 10-08-00151-CV

## IN THE INTEREST OF W.O., A CHILD

**From the 85th District Court
Brazos County, Texas
Trial Court No. 07-001152-CV-85**

## MEMORANDUM  OPINION

The parental rights of M.H. to her child, W.O., were terminated after a trial to the court.  M.H. appeals.  Because the trial court's best interest finding is supported by legally and factually sufficient evidence, we affirm.

### BACKGROUND

W.O. was born premature at 26 weeks gestation in January of 2007.  He had respiratory and digestive problems.  His parents were given accommodations at the nearby Ronald McDonald House, but they did not visit W.O. regularly.  The hospital staff was concerned.  They offered classes to train W.O.'s parents to take care of W.O.'s medical condition.  They did not avail themselves of this training.  W.O.'s parents left the Ronald McDonald House during the night one night.  The Department of Family

and Protective Services soon became involved. The Department took custody of W.O. in late April of 2007. M.H., W.O.'s mother, never saw the child again.

In one issue, M.H. argues that the evidence was both legally and factually insufficient to support the trial court's finding that it was in the child's best interest to terminate M.H.'s parental rights. *See* TEX. FAM. CODE ANN. § 161.001(2) (Vernon Supp. 2008). She generally argues that there were less restrictive means than termination to protect W.O.

## LEGAL AND FACTUAL SUFFICIENCY REVIEW

In conducting a legal sufficiency review in a parental termination case:

[A] court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusion and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. This does not mean that a court must disregard *all* evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)) (emphasis in *J.P.B.*).

In a factual sufficiency review,

[A] court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. . . . [T]he inquiry must be "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." A court of appeals should consider whether disputed

evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d 256, 266-67 (Tex. 2002) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)) (internal footnotes omitted) (alterations added).

## BEST INTEREST

An extended number of factors have been considered by the courts in ascertaining the best interest of the child. *Holley v. Adams*, 544 S.W.2d 367, 371 (Tex. 1976). The list is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent. *Id.*; *see In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2003). "[S]ome of the listed factors may be inapplicable to some cases, while other factors not listed may also be considered when appropriate." *In re S.A.P.*, 169 S.W.3d 685, 707 (Tex. App.—Waco 2005, no pet.); *see C.H.*, 89 S.W.3d at 27.

**Factors**

We review the evidence in light of the *Holley* factors.

*Desire of the Child*

W.O. was only 15 months old at the time of trial and had been in foster care since his release from the hospital.

*The Emotional and Physical Needs of the Child Now and in the Future*

W.O. was born premature at 26 weeks gestation. At the time of trial, he was still classified as a medically fragile child. He has a "trach" tube for respiratory support. He

requires 24-hour care in case the tube becomes blocked. If blocked, the tube needs timely suctioning or W.O. will die. W.O. may need the trach tube for at least four years. W.O. also needed a "g-button" to assist with digestion. However, shortly before trial, the g-button was removed to evaluate W.O.'s ability to digest.

*Danger to the Child Now and in the Future*

Training sessions to take care of W.O.'s trach and g-button were offered to M.H. up until the point of W.O.'s removal. M.H. availed herself of none of the training classes. M.H.'s mother, Deborah, whom M.H. argues on appeal could have been a placement option rather than having M.H.'s parental rights terminated, did not take the training classes either. Further, M.H. was placed on deferred adjudication community supervision for injury to a child. M.H. kicked a 12 year old for apparently trying to lift up M.H.'s skirt. M.H. admitted that at the time of the offense she was "on stones. I was on pills. I was drinking…earlier that day, I smoked embalming fluid. I smoked weed. I had always smoked weed…." M.H. claims she is now drug and alcohol free. M.H.'s community supervision was revoked and she was, at the time of trial, still incarcerated in SAFP, a substance abuse felony program.

*The Parental Abilities of the Individual Seeking Custody/ Programs Available to Assist the Individual to Promote the Best Interest of the Children*

Training sessions to take care of W.O.'s trach and g-button were offered to M.H. M.H. availed herself of none of the training classes. M.H.'s mother did not take the training classes either. The opportunity to transport M.H. to and from the hospital was offered by the Department to M.H. M.H. did not take advantage of the opportunity. At

least once, when transportation to the hospital was scheduled, M.H. was not at home at the time of the scheduled pick up and could not be located. M.H. has been in jail and SAFP since May of 2007. She only recently began parenting classes while in SAFP.

*Plans for the Children by the Individual or by the Agency Seeking Custody*

Two relatives of M.H. were given an opportunity to be considered for placement of W.O. One was his maternal grandmother, Deborah. One of her strengths was that she had an extended family willing to assist her in caring for W.O. But the Department decided she was not an appropriate placement because she did not take the required training classes to learn how take care of W.O. Further, Deborah had a history with the Department. Some of her own children had been removed from her care. M.H. was actually in foster care during a time in her life. Deborah also did not take her own blood pressure medication on a regular basis. The other relative withdrew her name from consideration.

The foster parents were not going to be an option for permanent placement of W.O. They took care of other medically fragile children on a temporary basis and wanted to continue that course of action.

M.H. generalized her plans for W.O. She agreed that she could not do anything while she was in SAFP, but she stated, "I'm going to do something when I get out." She said that when she got out, she would keep in contact with the judge and the Department's case workers, she would do some training, and she would do everything possible to get her son. She also stated that her "baby brother" would help her with

W.O.  M.H. also envisioned herself tending to all of W.O.'s necessities, taking him to the doctor, and participating in therapy with him.

*Stability of the Home or Proposed Placement*

M.H. has never had a home of her own.  She has always lived with someone. She has never had a job.  She never finished school.  At the time of the trial, M.H. was in SAFP.  She had been on deferred adjudication community supervision when her community supervision was revoked.  She was placed in the county jail in May of 2007 until there was an opening in SAFP.

*Acts or Omissions of the Parent Which May Indicate that the Existing Parent-Child Relationship is not a Proper One*

As stated earlier, M.H. had been placed on deferred adjudication community supervision for injury to a child.  She failed to complete a number of her conditions of community supervision, and within two years, her community supervision was revoked.  She was again placed on community supervision but was required to attend SAFP and was placed in the Brazos County Jail until she could attend SAFP.  This occurred four months after W.O. was born.  At the time of the trial, M.H. remained incarcerated in SAFP.

M.H. had not sought prenatal care prior to W.O.'s birth.  Training sessions to take care of W.O.'s trach and g-button were offered to M.H. up until the point of W.O.'s removal.  M.H. availed herself of none of the training classes.  The opportunity to transport M.H. to and from the hospital was offered to M.H by the Department.  M.H. did not take advantage of the opportunity.

M.H.'s visits to W.O. were irregular and became more sporadic as time passed. M.H. resided at the Ronald McDonald House in order to be close to W.O. but she often slept all day and then, when she visited W.O., she visited at night. Often, staff at the hospital could not contact M.H. at the Ronald McDonald House. She eventually left the Ronald McDonald House during the night and did not return. Authorities at the Ronald McDonald House would have asked M.H. to leave for not following the rules of the residence had M.H. decided not to leave on her own. After leaving the Ronald McDonald House, M.H. moved back to Bryan, Texas. W.O. was hospitalized in Temple.

M.H. did not ask the Department to help her find creative ways to follow the service plan while she was in jail and SAFP. The Department has previously had incarcerated clients ask for help. At one point, M.H.'s mother told a case worker that M.H. was lazy and just stayed around the house. M.H. did not want to get a job. Further, M.H. had never had a job. M.H.'s mother also stated to the case worker that M.H. wants to do things her way. M.H. had shown no motivation to care for W.O. And, since the Department took conservatorship of W.O., M.H. has not seen the child.

M.H.'s mother has custody of M.H.'s three-year old daughter.

### *Any Excuse for the Acts or Omissions of the Parent*

M.H. testified that she took at least two of the classes to learn how to take care of W.O. She explained that she did not take any more classes because she lost her means of transportation. She also explained that she did not visit W.O. regularly after she moved back to Bryan because she did not have child care. Even though her mother had custody of her other child, she took care of her child when her mother was at work.

M.H. testified that she visited W.O. day and night, every day while M.H. resided at the Ronald McDonald House. She speculated that the nurses did not always account for when she visited W.O. She explained the night-time visits as times when she could not sleep. She further explained that she did not visit W.O. for two weeks because she had severe hemorrhoids and had high blood pressure.

She also stated that she left the Ronald McDonald House on her own because W.O.'s father had left the residence the day before which left M.H. to take care of her other child. She could not visit W.O. while keeping the other child.

M.H. stated that once she moved to Bryan, she called "constantly" to check on W.O. She also stated that she had no transportation to be able to visit W.O.

M.H. acknowledged that it was her own fault she had not worked the Department's plan—she violated her "probation" and went to jail. But, she felt that she had not been given a chance to prove herself able to take care of W.O.

**Application**

After looking at the evidence in the light most favorable to the trial court's finding that termination of M.H.'s parental rights was in the best interest of W.O., we hold that a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. The evidence that termination was in the best interest of W.O. was legally sufficient.

After giving due consideration to evidence that the trial court could reasonably have found to be clear and convincing, we hold that the evidence was such that the trial court could reasonably form a firm belief or conviction that termination of M.H.'s

parental rights was in the best interest of W.O.  The evidence that termination was in the best interest of W.O. was factually sufficient.

M.H.'s sole issue is overruled.

**CONCLUSION**

Because we have found the evidence sufficient to support the finding that termination is in the child's best interest, the trial court's judgment is affirmed.

TOM GRAY
Chief Justice

Before Chief Justice Gray,
    Justice Vance, and
    Justice Reyna
    (Justice Vance concurs in the judgment with a note) *
Affirmed
Opinion delivered and filed December 23, 2008
[CV06]

\* "(The Texas Supreme Court says that the review of "best interest" findings should include the factors listed in section 263.307 of the Family Code, in addition to the *Holley* factors.  *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) ("There are several factors that should be taken into account when determining whether termination of parental rights is in the best interest of the child, including the stability of a proposed placement and the willingness of a child's family to effect positive changes.  TEX. FAM. CODE § 263.307; *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex.1976).)"; *see also, e.g., In re T.N.F.*, 205 S.W.3d 625, 632-34 (Tex. App.—Waco 2006, pet. denied) (applying and analyzing applicable section 263.307 factors).  In spite of this clear direction, the majority ignores the Family Code.  Applying all the applicable factors, I agree that the evidence is sufficient to support the finding, so I concur in the judgment.)"