**Affirmed and Memorandum Opinion filed October 27, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-15-00419-CV

### IN THE INTEREST OF D.J.V., A CHILD

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-04657J**

## M E M O R A N D U M     O P I N I O N

A.B.S. (Mother) appeals the trial court's final decree terminating her parental rights with respect to her son, David.[1] David's father, whose parental rights were also terminated, does not appeal. Mother raises two issues concerning the legal and factual sufficiency of the evidence to support the trial court's findings

---

[1] We use fictitious names to refer to the children discussed in this opinion. *See* Tex. R. App. P. 9.8(b)(2).

that termination was proper under section 161.001(1)(O) of the Texas Family Code[2] and that termination is in David's best interest. We affirm.

## I.   BACKGROUND

Mother has three children by three fathers: Sean, born in May 2005; David, born in February 2009; and Jason, born in November 2011. David is the sole subject of this proceeding, though facts about Sean and Jason are relevant.

Over the course of fifteen days in June 2013, the Texas Department of Protective and Family Services (the Department) received three referrals regarding the safety of the boys, all of whom lived with Mother. The first concerned a knot on the back of Jason's head. The second and third arose from allegations that Mother left the boys alone at least three times for hours at a time. The last time Mother left them alone, Sean reportedly went door to door in their apartment complex asking for food. A neighbor called the police. The police arrested Mother for child endangerment of Jason. The Department then took the children into protective custody, and the trial court appointed the Department temporary managing conservator of David.

Trial began on August 14, 2014, and spanned three days over eight months.[3] The Department sought termination of Mother's parental rights under section 161.001(1)(D), (E), (L), and (O) of the Family Code. Tex. Fam. Code Ann. § 161.001(1) (West 2014). Following closing arguments, the trial court announced

---

[2] The numbering of section 161.001 changed effective September 1, 2015. Section 161.001(1) is now section 161.001(b)(1). Act of June 18, 2015, 84th Leg., R.S., ch. 944, § 11, 2015 Tex. Sess. Law. Serv. 3271 (West) (to be codified at Tex. Fam. Code Ann. § 161.001(b)(1)). Mother's case is governed by the preceding version, effective January 1, 2011. We refer to the 2011 version in this opinion.

[3] Jason was the subject of another termination proceeding and was living with his paternal grandmother while his father petitioned another court for primary custody. Sean was living with his father, who planned to petition for primary custody as well.

on the record its findings that termination was warranted under two of the four subsections: L (violation of the Penal Code) and O (failure to comply with the court-ordered family service plan). The court also found termination of Mother's and David's father's parental rights was in David's best interest. *Id.* § 161.001(2). The court signed the final decree of termination on April 15, 2015, memorializing its oral findings and appointing the Department as David's sole managing conservator. Mother timely appealed.

## II. BURDEN OF PROOF AND STANDARDS OF REVIEW

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *accord In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d at 358.

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act described in section 161.001(1) of the Texas Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001. Only one predicate finding under section

161.001(1) is necessary to support a decree of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *In re J.O.A.*, 283 S.W.3d at 344; *In re J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

## III.  PREDICATE TERMINATION GROUNDS

The trial court predicated termination of Mother's parental rights on subsections L and O of section 161.001(1) of the Texas Family Code.

Mother does not challenge the subsection L finding on appeal. An unchallenged fact finding is binding on an appellate court "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (unchallenged findings of fact supported termination under section 161.001(1)(O) because record supported those findings); *In re C.N.S.*, No. 14–14–00301–CV, 2014 WL 3887722, *7 (Tex. App.—Houston [14th Dist.] Aug. 7, 2014) (mem. op.) (same).

As discussed below, our review of the record leads us to conclude there is no evidence of one of the facts necessary to support a finding under subsection L. Therefore, that finding, even though unchallenged by Mother, is not binding on us.

### A.  Violations of the Penal Code (Subsection L)

Subsection L permits termination when clear and convincing evidence shows the parent "has been convicted or placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under . . . [certain] sections of the Penal Code. . . ." Tex. Fam. Code Ann. § 161.001(1)(L); *In re A.L.*, 389 S.W.3d 896, 900 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "Serious injury" is not defined in the Family Code. When a term is not defined in a statute, we apply its ordinary meaning. Tex. Gov't Code Ann. § 312.002 (West 2013); *City of San Antonio v. Hartman*, 201 S.W.3d 667, 672 n.19 (Tex. 2006); *In re A.L.*, 389 S.W.3d at 901. We previously described "serious injury" as follows:

> "Serious" means "having important or dangerous possible consequences," while "injury" means "hurt, damage, or loss sustained."

*In re A.L.*, 389 S.W.3d at 901 (following *C.H. v. Dep't of Family & Protective Servs.*, No. 01–11–00385–CV, 01–11–00454–CV, 01–11–00455–CV, 2012 WL 586972, *6 (Tex. App.—Houston [1st Dist.] Feb. 23, 2012, pet. denied) (mem. op.).

One of the enumerated sections of the Penal Code is section 22.041, which concerns abandoning or endangering a child. *Id.* § 161.001(1)(L)(x). A person commits an offense under section 22.041 if she "knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." Tex. Penal Code Ann. § 22.041(c) (West 2011).

Subsection L requires proof of two facts: (1) the death or serious injury of a child, for which (2) the parent was convicted or placed on community supervision. *See In re A.L.*, 389 S.W.3d at 900–01 ("serious injury" requirement applies to each offense listed in subsection L).

The Department introduced evidence of two deferred adjudications for Mother: one for endangering Jason in 2013 (the offense for which she was arrested when this case began), and one for endangering David in 2011. Mother pleaded guilty to both charges.

***Charge of endangering Jason.*** Mother signed a judicial confession in which she agreed that on or about June 22, 2013, she intentionally and recklessly placed Jason in danger of bodily injury by leaving him in the apartment without food or adult supervision.[4]

---

[4] However, in her statements to Department personnel and in her testimony at trial, she

6

***Charge of endangering David.*** The record does not contain the judicial confession or the indictment for the 2011 deferred adjudication concerning David, so we do not know the facts she confessed. Mother testified about that charge at trial, though:

> Q. [Y]our conviction in 2011, you left your children home alone; is that correct?
>
> A. Yes.
>
> Q. And you pled guilty to endangering your children and leaving them home alone?
>
> A. Yes.
>
> Q. In that case, they were home alone all night and your children went in to a neighbor's house at midnight and fell asleep on a neighbor's couch; is that accurate?
>
> A. No.
>
> Q. But you still pled guilty?
>
> A. Part of it is accurate and the other part not accurate.
>
> Q. But you pled guilty to that, correct?
>
> A. Yes.

There is evidence of both deferred adjudications, but there is no evidence of a serious injury to either Jason or David that resulted from Mother's endangering them. While death or serious injury is an inherent element of some of the offenses listed in subsection L (e.g. murder, manslaughter, and assault), "serious injury is not an element of child endangerment." *In re N.M.*, No. 07–13–00325–CV, 2014 WL 718657, *4 (Tex. App.—Amarillo Feb. 21, 2014, no pet.) (mem. op.) For that reason, the Department was required to prove the child suffered a serious injury. Because we do not know the facts underlying the 2011 deferred adjudication, we

---

denied leaving him alone. She said she was advised to "plead guilty or [the Department is] going to terminate my rights while I was on trial for the criminal case."

cannot say if David suffered a serious injury. Therefore, the Department failed to meet its burden of proof with regard to subsection L.

Because we are not bound by the trial court's finding on subsection L, we will not affirm the judgment on the basis of that finding. Accordingly, we will review the evidence to support the trial court's finding under subsection O.

## B.     Failure to Comply with Court Order (Subsection O)

Termination is warranted if the court finds by clear and convincing evidence that the parent:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

Tex. Fam. Code Ann. § 161.001(1)(O).

Mother concedes (1) she failed to comply with the court-ordered family service plan, and (2) the Department had temporary managing conservatorship of David for not less than nine months. However, she contends the Department did not prove the third element: that David was removed from her care due to abuse or neglect.

### 1.     "Removal . . . for the abuse or neglect of the child"

In the past, courts of appeals disagreed about what it meant for a child to be removed for abuse or neglect. Some held only the actual abuse or neglect satisfied that portion of subsection O.[5] At least one held "abuse or neglect" under subsection O includes the risk of abuse or neglect.[6]

---

[5] *See, e.g.*, *In re C.B.*, 376 S.W.3d 244, 252 (Tex. App.—Amarillo 2012, no pet.); *Mann*

8

In 2013, the Texas Supreme Court agreed with the latter holding and concluded subsection O contemplates both actual abuse or neglect and the risk of abuse or neglect. *In re E.C.R.*, 402 S.W.3d at 246. The court wrote:

> "[A]buse or neglect of the child" necessarily includes the risks or threats of the environment in which the child is placed. Part of that calculus includes the harm suffered or the danger faced by other children under the parent's care.

*Id.* at 248.

Mother argues that although she was arrested for endangering Jason, the Department did not prove she abused or neglected David. That argument is unpersuasive for two reasons. First, the supreme court rejected it in *In re E.C.R.* Evidence of "danger faced" by Jason is some evidence that David was removed for abuse or neglect. *See id.* at 248. Second, as we discuss next, the record contains legally and factually sufficient evidence of Mother's actual neglect of David, not just a risk of neglect due to her neglect of one of his brothers.

## 2. Evidence of abuse or neglect of the children

Mother was charged twice for child endangerment. She pleaded guilty to each charge. She admitted at trial that she left the children, who were not old enough to care for themselves, alone on the day she was arrested and they were removed. Considering all the evidence in the light most favorable to the finding, and disregarding all the evidence the trial court could reasonably have disbelieved, we conclude the evidence is legally sufficient to support the trial court's finding that David was removed from Mother's care due to abuse or neglect.

---

*v. Dep't of Family & Protective Servs.*, No. 01–08–01004–CV, 2009 WL 2961396, at *7–8 (Tex. App.—Houston [1st Dist.] Sept. 17, 2009, no pet.) (mem. op.); *In re S.A.P.*, 169 S.W.3d 685, 706–07 (Tex. App.—Waco 2005, no pet.).

[6] *In re M.L.J.*, No. 02–07–00178–CV, 2008 WL 1932076, *5 (Tex. App.—Fort Worth May 1, 2008, pet. denied) (mem. op.).

At trial Mother said her guilty plea to one of two charges of child endangerment was false in that she did not leave her children alone. She also contended the children were supervised by her neighbor. That testimony is relevant to our factual sufficiency review, in which we consider the entire record, including disputed or conflicting evidence. However, we cannot say her denials are so significant that the trial court could not have reasonably found David was removed due to abuse or neglect. We are mindful of our role as reviewers; we give due deference to the trial court's findings, and we cannot substitute our judgment for the trial court's judgment. *See In re H.R.M.*, 209 S.W.3d at 108.

Mother concedes (1) she failed to complete court-ordered services, and (2) the Department was David's temporary managing conservator for not less than nine months. The trial court's finding as to the third requirement of section 161.001(1)(O), that David was removed from Mother's care for abuse or neglect, is supported by legally and factually sufficient evidence. We overrule Mother's first issue.

## IV.   BEST INTEREST OF THE CHILD

Termination must also be in the child's best interest. Tex. Fam. Code Ann. § 161.001(2). We review the entire record in deciding a challenge to the court's best-interest finding. *See In re E.C.R.*, 402 S.W.3d at 250.

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a).

10

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In addition, the Texas Family Code sets out thirteen factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 263.307(b). Factors applicable to this case include:

1.    the child's age and physical and mental vulnerabilities;
2.    the frequency and nature of out-of-home placements;
3.    the magnitude, frequency, and circumstances of harm to the child;
6.    the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;
8.    whether there is a history of substance abuse by the child's family or others who have access to the child's home;
10.    the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

11. the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and

12. whether the child's family demonstrates adequate parenting skills, including providing the child with:

    (a)    minimally adequate health and nutritional care;

    (b)    care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (c)    guidance and supervision consistent with the child's safety; and

    (f)    an understanding of the child's needs and capabilities.

*See id.*; *In re R.R.*, 209 S.W.3d at 116.

## A. Mother's parenting abilities

As required by her family service plan, Mother completed an eight-week course called "Nurturing Program Parenting Class." She also underwent a psychological evaluation and engaged in individual therapy and family therapy with David and Jason.

The therapy sessions are best considered in three groups: sessions in early 2014 (the First Therapy Sessions); sessions later in 2014, which occurred after trial began (the Second Therapy Sessions); and sessions in early 2015, which occurred between the second and third days of trial (the Third Therapy Sessions). Denise Jones[7] conducted the evaluation, the First Therapy Sessions, and the Second Therapy Sessions. Her supervisor, Uche Chibueze, conferred with Jones weekly about the case. Gabriella Morgan conducted the Third Therapy Sessions.

***First Therapy Sessions.*** According to Chibueze, Mother attended and was an active participant in all the First Therapy Sessions. She met all her treatment goals, including improving her parenting abilities and being able to modulate her

---

[7] Jones is alternately referred to in the record as Angela and Denise.

emotions when parenting her children. Still, there was work to be done, specifically with how Mother dealt with David's behavior outbursts. At the time she testified, in August 2014, Chibueze did not recommend termination of Mother's parental rights. Instead, she recommended Mother continue to get services and the case be reevaluated in the future.

Jones testified in January 2015. She confirmed Mother attended all the First Therapy Sessions, actively engaged in the process, was open to suggestions, and welcomed Jones' input on how to be a better parent. Throughout the First Therapy Sessions, Mother improved in interacting with David and Jason, showing them affection and responding appropriately when they acted out or were upset. Mother admitted she made a mistake by leaving her children alone, and over time she grew to understand the gravity of her choice. However, she did not disclose that she had been charged with child endangerment. Jones said her failure to disclose that fact "was a concern."

Mother was discharged from therapy once she completed the First Therapy Sessions. Jones recommended in her closure report that Mother be able to spend more time with her children in a community setting more casual than the Department's office, such as McDonald's or a park.

***Problematic visits with David.*** Following her discharge, Mother had community visits with David and Jason for about three months. According to caseworker Nicole Franco, however, the visits did not go well. Franco testified about a two-hour visit at McDonald's in October 2014:

> [The visit] was particularly disturbing to me because it was very similar to the very first visitation that I had ever, ever observed with this family in regards to the way mom interacted with the children. [David] had an emotional breakdown the entire — just about the entire visitation. Mom was not able to console him. She regressed

13

back to the same behaviors that I observed in that very first visit when I was first assigned the case. She would call him a baby, compare him to a sibling and tell him there was nothing wrong. That was the visit where she had grabbed his wrist and pulled him face to face with her. She wasn't consistent and put him in time out telling him he had to sit there for not an appropriate amount of time. And then she would come back and start talking to him again. She got frustrated and left the visitation area. Went out to her car and then she had kept going out to purchase food. She went out and got her cell phone and plugged it into the wall in her cell phone [sic] and [David] was clinging to her legs crying.

The other child [Jason] was crawling up into a chair behind her and, finally, I had to tell her to turn around and supervise him. It was just that it was really disturbing in the sense that I didn't see the application of any of the skills that I know has [sic] been taught during the parenting classes or that were noted to be reinforced during therapy sessions.

Franco then sent Mother back to therapy for the Second Therapy Sessions.

*Second Therapy Sessions.* Jones saw Mother and David together only once in the Second Therapy Sessions. She said the visit took place at the Department's office and Mother's interaction with David was "fine that day." David and Mother had a bond, and David liked the interaction with her. Jones said it "might be beneficial for both of them to continue to have a relationship."

However, when asked if Mother seemed to have learned the skills Jones taught her, Jones answered, "Not at this time." ("This time" was January 2015.) She recommended that David not be returned to Mother at that point, though she was not foreclosing the possibility that it would be appropriate to return him to her in the future. Jones said as long as Mother could "make the needed changes and get some help," she did not recommend termination of Mother's rights.

*Third Therapy Sessions.* Gabriella Morgan testified on the third day of trial, in April 2015. She had met with Mother twice, once individually and once with

David, about a month earlier. She was aware Mother and David had been in therapy in 2014, but she did not have access to Chibueze's and Jones' reports.

The Third Therapy Sessions seem to have been similar to the First Therapy Sessions in terms of Mother's good attitude and progress. Mother was open to educational comments, was willing to accept Morgan's help, and seemed sincere about wanting to become a better mother.

Mother had learned in a previous session (the record is not clear which therapist conducted that session) that she should get on the floor and play with the children. For her family session with David, Mother wore comfortable clothes, rather than a dress, so she could crawl around the floor and play. David began to cry and became very clingy with Mother during that visit. Morgan encouraged Mother to "use positive body language and firm words to decrease his level of anxiety." David responded well.

However, Morgan said Mother denied leaving her children alone. Morgan implied her denial was troublesome:

> The first thing I look for is acknowledgement, taking responsibility, accountability, and that tells me that is the first sign there is a potential for change. . . . And I did not hear that.

Morgan concluded by agreeing Mother would benefit from continuing to work on the behavior techniques she was learning.

### B. Substance abuse

Franco believed Mother tested positive for marijuana early in the case. However, she said Mother tested negative on all her subsequent drug and alcohol screenings.

Jones mentioned Mother's substance abuse in her therapy progress reports. She said Mother admitted to using drugs occasionally and choosing to associate

with people who used drugs. She was able to express why using drugs is a poor choice, and she understood how it affects her ability as a parent.

## C.     Stability and permanency

*Mother.* Mother secured suitable housing for herself and the children. She rented a two-bedroom apartment. The family service plan required her to identify any person living with her and state the nature of their relationship. In April 2014, the Department learned an undisclosed paramour might be living with Mother. She denied the allegation.

Mother maintained employment throughout the case. She had several jobs. She said she sometimes worked two jobs at a time.

*Proposed placement.* The Department wanted David to live with and be adopted by his maternal aunt, Mother's older sister. His aunt testified that David was "absolutely" happy in her home. She said, "I don't consider him a handful. I consider the fact that he has been through a lot, and I can tell that, you know, he is lacking something." David calls his aunt "Mom," but when talking to a third party, he refers to her as his "auntie."

Child Advocates, Inc. was appointed to be David's guardian ad litem. Meredith Wallace, the advocacy coordinator for Child Advocates, testified Child Advocates also wanted David to be adopted by his aunt. Wallace believed termination was in David's best interest because Mother "has not shown that she can support a safe and stable environment for herself."

## D.     David

*Desires and needs.* David was five years old when trial began and a little over six when it concluded. He did not testify at trial, and no evidence was

presented about his desires. The record does not reflect any special physical needs he may have.

Jones' therapy progress reports note that David has difficulty expressing his feelings and controlling his emotions. Over the course of therapy sessions with David, Mother improved in interacting with him. She was "very supportive and interactive" throughout one of the later of the First Therapy Sessions and was "doing better showing affection and expressing support and appreciation." Even with David's and Mother's progress, Jones concluded David "will need more specialized behavior modification intervention" in the future.

Franco testified about David's progress over the nearly two years he had been in the Department's custody. In June 2013, he was shy and had scars down his back. He struggled with communicating, especially with expressing his emotions. He was developmentally behind in social skills, such as eating at a table with utensils. (Mother denied the accuracy of that assessment.) By the time of trial, David had made "significant progress" with his social skills, but Franco said he regresses when he is with Mother during visits and therapy sessions. According to Franco, "[h]e gets very clingy, very attention seeking. He has emotional breakdowns. He won't make eye contact. Not very playful or interactive. And kind of jealous of his sibling and, like, wanting more attention." Following visits with Mother, David reportedly would sometimes urinate in bed and would always have an increase in behavioral problems at school.

***Danger.*** The record contains evidence, discussed above, that David was endangered while living with Mother. Mother signed a Child Safety Evaluation and Plan dated April 17, 2012, in which she "agree[d] not to leave her children unattended." Nonetheless, she left David and his brothers alone and unsupervised.

Mother pleaded guilty to charges of child endangerment of David and Jason. She contends, however, that she was not in fact guilty of either charge. Mother also disputes that the children were unsupervised on the day of her arrest; she maintains she arranged for a neighbor to supervise them.

Considering all the evidence, as we are charged to do in a best-interest evidentiary review, we conclude the trial court could reasonably have found termination of Mother's parental rights was in David's best interest. We overrule Mother's second issue.

## V.    CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/    Tracy Christopher
       Justice

Panel consists of Chief Justice Frost and Justices Christopher and Donovan.

18